## THE ERINAGH.

(*District Court, S. D. New York.* January, 1881.)

WATCHMAN'S SERVICES—MARITIME LIEN—LIEN UNDER STATE LAW—MASTER OF BRITISH VESSEL—LIEN—PRIORITY.

The master of the British bark E., having arrived at quarantine with a cargo for this port, contracted, September 24th, with libellant to furnish a watchman. All the crew had been sent to the hospital with yellow fever, and did not return. The master also left on the twenty-fourth, and died of the fever November 19th. The watchman remained on board until November 29th, when the marshal sold her under process in another suit, having seized her October 29th, at which time the cargo was discharged.

The surplus remaining in the registry of the court, after satisfying other liens, was insufficient to satisfy the master's claim for wages and the watchman's for services.

On exceptions to the commissioner's report as to amounts due each, and their priority of payment,—

*Held*, that the claim for watchman's services after October 29th was properly disallowed as not within the terms of the contract, and because no further necessity for the services was shown.

That it was not allowable, either, under the state law,—3 Rev. St. N. Y. (6th Ed.) 783,—which does not purport to enlarge the power of the master, who could not bind the vessel for services after the necessity therefor ceased to exist, the cargo having been discharged and the marshal having taken possession.

That the watchman's services prior to October 29th, being for the benefit of all interested in the ship, constituted a maritime lien.

That this ruling accords with the present view of what constitutes a maritime contract, the test applied in the case of *The Harriet*, and other cases, having been considerably modified by subsequent decisions of the courts. *The Windermere*, 2 FED. REP. and cases cited.

*Also held*, that the lien of the master, which he had by the English law as security for his wages, and which is enforceable in the admiralty, (*The Wexford*, 3 FED. REP.,) should be deferred to the maritime lien of the watchman with whom he contracted for the latter's services in this port.

In Admiralty.

*W. Mynderse*, for libellant Van Hoesen.

*J. A. Deady*, for Bowden's administrator.

CHOATE, D. J. In this case the vessel has been sold and various parties having undoubted maritime liens have been paid, and there remains a surplus in the registry of the court. No claim was made by the owners. Among the libels filed against the vessel were those of Van Hoesen, filed November 23, 1880, and of Bowden, filed November 8, 1880. The claim of Bowden, who has since died, was for his wages as master. The vessel was English, and by the English law the master has a lien on the vessel which it has been held can be enforced in the admiralty, the contract being maritime, although by the maritime law he has no lien. *The Wexford*, 3 FED. REP. 577. Bowden's claim, which is now prosecuted by his administrator, is more than sufficient in amount to absorb the entire surplus in the registry. Van Hoesen's claim is for furnishing a watchman on the vessel under the following circumstances: On her arrival in port the vessel had the yellow fever on board. She came in with a cargo to be delivered here. The crew were all sent to the hospital, and the master, on the twenty-fourth of September, 1880, made a contract with the libellant Van Hoesen to furnish a watchman or ship-keeper at an agreed rate per day. The vessel was then at quarantine. The watchman went on

board and the vessel remained at quarantine till October 13th, when she was towed to Green Point, Long Island. She remained at Green Point till November 18th, and was then towed to the Atlantic dock, Brooklyn, where she was sold by the marshal on the twenty-ninth of November. She had been seized by the marshal under his process on the twenty-ninth of October. The cargo was discharged the same day. The captain went into hospital on the twenty-fourth of September, the day he made the contract for the employment of the watchman, and he died of the fever on the nineteenth of November. Neither he nor the crew returned to the vessel after September 24th. The watchman remained on the vessel till November 13th, and Van Hoesen's claim is for his services up to that day; but the commissioner has disallowed his claim for the service of the watchman after the twenty-ninth of October, on the ground that no necessity is shown for the service after the marshal took possession, and on the ground that the contract was for his service during the state of things existing at the time he was employed, and that that state of things was terminated by the discharge of the cargo and the attachment of the vessel.

An exception has been filed to the disallowance of Van Hoesen's claim after October 29th, but I think its disallowance is clearly right, for the reasons given by the commissioner. It is claimed, however, that the watchman has a lien under the state statute,—3 Rev. St. N. Y. (6th Ed.) 783,— and that such lien, though perhaps not for a maritime service after the seizure of the vessel, is superior to the claim of the master. But the state statute does not purport to enlarge the power of the master, or to authorize him to employ a watchman unless the same is necessary for the vessel. In this case, when the master employed the watchman, it was necessary. That necessity did not continue after her seizure. The employment must be held to have ceased when the necessity that led to the employment obviously ceased by the discharge of the cargo and the passing of the vessel into the custody of the marshal. If the watchman did not discover that

the vessel was in the custody of the marshal it was his own fault.

The commissioner allowed Van Hoesen's claim up to October 29th, amounting to $94.94, and reports that out of the money in the registry that sum should be first paid, and that the residue, $34.71, should be paid to the administrator of Bowden. The libellant Van Hoesen excepts on the ground that the report does not allow him any costs. As to this point there was no need of an exception. The matter of costs was not referred, and is in the discretion of the court. Nor is the report to be construed as passing on that question at all. Bowden's administrator excepts on the ground that the whole surplus is not allowed to him.

The questions are—*First*, whether Van Hoesen has a claim which can be paid out of the surplus; and, *secondly*, if he has, whether it takes precedence of the master's claim for wages. In the case of *The Trimountain*, 5 Ben. 250, it was held that the wages of a watchman employed on the vessel in port prior to her seizure by the marshal should be paid out of the surplus in preference to the claim of the assignee in bankruptcy of the owner of the vessel. It is there said by Judge Benedict that "such services, being rendered for the benefit of all interested in the ship, create a lien upon the ship. They constituted one of the privileged demands under the ordinance, and are so ranked in the Code de Commerce." Several cases are referred to as authority against the proposition that there is a maritime lien on the ship for the wages of a watchman in port. *Gurney* v. *Crockett*, Abb. Adm. 490; *The Harriet*, Olc. 229; *The John T. Moore*, 4 Am. L. T. R. (N. Y.) 410; *The E. A. Barnard*, 2 FED. REP. 715, 720. In the first two cases referred to, which were decisions in this court in 1845 and 1849, the claims of watchmen employed upon a vessel laid up, and not at the time employed in any voyage, or in the performance of any contract of affreightment, were disallowed, as not being for services maritime in their nature. The test, then, applied to determine whether a contract was maritime or not, has, I think, been since that time consider-

ably modified by decisions of the courts. *The Windermere,* 2 FED. REP. and cases cited; *The River Queen,* Id. 731; *The ·Onore,* 6 Ben. 564. The cases of *The John T. Moore* and of *The E. A. Barnard* appear also to have been cases of vessels laid up and not in use for purposes of commerce. Judge Woods, in the case of *The John T. Moore,* cites, in support of the disallowance of the claim, the case of *The Thomas Scattergood,* 1 Gilpin, 1. In that case, which was decided in 1828, the claim was disallowed—partly, at least—on the ground that it had no connection with any voyage performed or to be performed. It was a claim for service by the mate as ship-keeper, after he had been discharged as mate, and after his wages as mate had been paid to him, and after the discharge of the cargo, and for part of the term of service after the marshal had taken possession of the vessel. None of the cases cited, therefore, presented the same reasons that the facts of this case do for holding the service of the watchman to be a maritime service. And whatever may be the rule upon the facts of those cases, where the vessel was laid up, undergoing repairs, dismantled, or not engaged in any voyage, or earning freight, I have no hesitation in holding that it is in accordance with the present view of what constitutes a maritime contract, that the service of a watchman on board a vessel coming into port utterly disabled by the sickness of her crew, and having on board a cargo to deliver in order to earn her freight, is a maritime service for which there is a maritime lien on the ship.

In respect to the relative priority of the wages of the watchman and the master, I think it clear that the claim of the watchman has the preference. His lien is a maritime lien. That of the master, though a lien given as security for a maritime contract, is a lien created by a foreign statute in favor of the very person who, on behalf of the vessel, contracted this other maritime debt, which purported, by the general maritime law, to carry with it, as security, a tacit hypothecation of the vessel. I think, therefore, that the master, having contracted the debt in this port, cannot set up against the maritime lien, which the contract implied, his

own lien under a foreign statute, so as to defeat its payment altogether. The equity of the watchman against the master is, of course, also very strong, because the master was personally bound to pay the debt. *The Selah,* 4 Sawy. 40. See, also, *The Wexford, ut supra.*

The exceptions are therefore overruled, the report confirmed, and the claim of Van Hoesen, as allowed by the commissioner, will be first paid, with costs, and any residue will be paid to the administrator of the master.