**HERCULES CO., Inc.**

v.

**The BRIGADIER GENERAL ABSOLOM BAIRD et al.**

**No. 11208.**

United States Court of Appeals
Third Circuit.

Argued Jan. 19, 1954.

Decided June 17, 1954.

Logan Cresap, New York City, for appellant.

Vincent A. Catoggio, New York City (Purdy, Lamb & Catoggio, New York City, on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This is a libel in rem seeking to assert a maritime lien for repairs fur-

nished to the Steamship Brigadier General Absolom Baird. There were two defense theories, one jurisdictional and the other going to the merits. The district court decided both in favor of the claimant and dismissed the libel, and the libellant appeals.

The services for which the lien is sought were furnished at two separate times, the first in the spring and summer of 1950 and the second in the spring of 1951. It is not denied that the labor and services were performed nor that the amount claimed is reasonable.

█ In order that claimant's jurisdictional point may be understood, it is necessary to set out the facts showing the physical condition of the Baird. She was a steel, steam screw vessel, built in 1919 and was over 690 gross tons, 161 feet in length, 32 feet abeam, with a draft of about 13 feet. In 1946 she had been sold by the United States Maritime Commission to the United Boat Service Corporation, her record owner when the 1950 services were performed. In 1950 she had no Coast Guard certificate of inspection, and there is no evidence as to whether she was registered or enrolled. Libellant's services were performed while she was at the Todd Shipyard in Hoboken, New Jersey. The purpose of the services was to help prepare the Baird for a sealing voyage off the coast of Labrador. The 1950 services were begun on April 3 and continued, with some interruptions, until July 17 when, the work not having progressed sufficiently to enable her to depart for the 1950 sealing season, it was discontinued and she

was towed to anchorage off City Island in the East River. There she remained until some time before March 19, 1951, when she was towed back to the Todd Shipyard where libellant again furnished services preparatory to the Baird's sailing for the 1951 sealing season. She actually sailed on that voyage in April of 1951. The only findings of fact made by the district court relating to the Baird's condition were that she was of more than 200 tons, that she was towed to and from Hoboken, and that "At the time the * * * [1950] labor and services were furnished to the vessel she was not in commission and she was unable to sail." The conclusion of law apparently premised on this finding was that "The vessel was a 'dead' ship and no maritime lien arose * * *." This conclusion of law seems to indicate that the district court treated the "dead ship" proposition as a defense on the merits. As we understand it, however, it is a jurisdictional matter and will be so treated here.[1] The concept is that when the 1950 services were performed, the Baird was a dead ship, i. e., not a maritime object, and, therefore, there was no admiralty jurisdiction. The legal theory underlying this contention is that, while admiralty jurisdiction in tort depends upon locality,[2] admiralty jurisdiction in contract depends upon the presence of a maritime flavor in the subject matter of the contract.[3] Therefore, if the subject matter of the contract were a nonmaritime object, there would be no admiralty jurisdiction.

█ Claimant's objection assumes that the Baird was a "ship," the point being made that she was "dead," that is, withdrawn from navigation and marine

---

1. The district court's process of reasoning seems to have been that, if the structure were held to be a dead ship, there would be no maritime lien. Our view is that if the structure were a dead ship, there would be no admiralty jurisdiction and for that reason there could be no maritime lien.

2. North Pacific Steamship Co. v. Hall Bros. Co., 1919, 249 U.S. 119, 39 S.Ct.

221, 63 L.Ed. 510; 1 Benedict, Admiralty § 128 (6th ed. 1940); Robinson, Admiralty § 9 (1939).

3. North Pacific Steamship Co. v. Hall Bros. Co., supra note 2; Insurance Co. v. Dunham, U.S.1870, 11 Wall. 1, 20 L. Ed. 90; The Hiram R. Dixon, D.C.E.D. N.Y.1887, 33 F. 297, opinion by Judge Benedict; 1 Benedict id. § 62; Robinson id. § 19.

commerce. It is a fact that in 1950 the Baird was not properly documented, since she had no certificate of inspection from the Coast Guard, without which she could not have been cleared to sail even if able, which she was not. We think, however, that the presence or absence of complete documentation, important as it may be for many other purposes, does not of itself determine whether a floating object is or is not a vessel subject to admiralty jurisdiction. Nor is it necessarily fatal that in 1950 and a part of 1951 the Baird was unable to navigate under her own power. An essential element of claimant's objection is a finding that the Baird had been withdrawn from marine commerce and navigation. There is no such finding here, and we think this record could not support one if it had been made. Indeed, the efforts of everyone concerned were bent upon readying her for a sealing voyage. That is a sufficient devotion to marine commerce to make her a vessel.[4] She need not actually hoist anchor on beginning that voyage to become a vessel. Once given a completed vessel, we think that the purpose and business of the craft or use for which she is intended when the repairs are completed are the factors which determine whether there is admiralty jurisdiction.[5] Here libellant's services were ordered and furnished to prepare the Baird to go sealing, an obvious maritime venture. When the services were performed, she was tight and navigable, at least to the extent that she could be towed. In 1950 libellant's employees worked on the boat falls, chipped and scaled the side, chipped, scaled, and painted the superstructure, foremast, aftermast, painted the foredecks and forecastlehead, and cleaned and painted the holds. This is the work ordinarily done by a vessel's crew when preparing for a voyage. In 1951 libellant's men worked as firemen, keeping up steam, at first merely to run the bilge pumps but later to turn over the main engines preparatory to sailing. This is work customarily done aboard a live vessel. If the Baird ever was withdrawn from navigation and maritime commerce, she was returned to those pursuits when her owners and would-be owners began putting her in shape for an intended voyage, which in fact took place in April of 1951, libellant's services being largely responsible for her ability to depart on that voyage. If the craft involved in North Pacific Steamship Co. v. Hall Bros. Co., 1919, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510, was a vessel, we have little doubt that the Baird was. There the Yucatan was moored at dock in Puget Sound and was in need of very extensive repairs. She had been wrecked and submerged for a long time. Ice floes had torn away her upper decks, and some bottom plates required replacing. She was under charter for an Alaskan voyage, to be commenced as soon as the necessary repairs were completed. The libellant furnished those repairs, and the Supreme Court affirmed the assertion of a maritime lien on the vessel.

We feel the same hesitancy here to extend the scope of the asserted "dead" ship theory that the Supreme Court felt in New Bedford Dry Dock Co. v. Purdy, 1922, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482, where it refused to enlarge the scope of the rule which holds new construction to be nonmaritime.[6] We hold that in 1950 and 1951 the

4. The Steamship Jefferson, 1909, 215 U. S. 130, 30 S.Ct. 54, 54 L.Ed. 125; Campbell v. Loznicka, 5 Cir., 1950, 181 F.2d 356; Jeffcott v. Aetna Ins. Co., 2 Cir., 129 F.2d 582, certiorari denied, 1942, 317 U.S. 663, 63 S.Ct. 64, 87 L.Ed. 533; Kilb v. Menke, 5 Cir., 1941, 121 F. 2d 1013; Rubin Iron Works, Inc. v. Johnson, 5 Cir., 1939, 100 F.2d 871; The V-14813, 5 Cir., 1933, 65 F.2d 789; The Hiram R. Dixon, supra note 3.

5. "* * * In fact, neither size, form, equipment nor means of propulsion are determinative factors upon the question of jurisdiction, which regards only the purpose for which the craft was constructed, and the business in which it is engaged." The Robert W. Parsons, 1903, 191 U.S. 17, 30, 24 S.Ct. 8, 12, 48 L.Ed. 73.

6. "* * * We are not disposed to enlarge the compass of the rule approved

Baird was a vessel and, therefore, a contract to repair and ready her for a voyage is sufficiently maritime to support the jurisdiction of a court of admiralty.[7]

We turn now to the merits, setting out some additional facts necessary to a disposition of the question.

Libellant first sent its men aboard the Baird pursuant to the order of one Gunderman, who said that he was the vessel's chief officer. From then on in 1950, the work was done under his direction. Gunderman was taking his orders from a W. Ellison. A receipt for each day's work in 1950 was signed by Gunderman as chief officer. A statement covering the 1950 work was marked "accepted" and signed by W. Ellison for the Chester Import Company. At the time the 1950 services were performed, United Boat Service Corporation was the Baird's record owner, and a Captain Grening, testifying for claimant, stated that at that time he and United Boat Service were the sole owners, although his name does not appear on the abstract of title. Grening lived aboard the Baird during the time the 1950 services were performed and observed their progress. He was a master mariner and was addressed as captain aboard the ship. He said that he not only was a part owner himself but

was on board to represent the other owner, United Boat Service. It appears that Chester Import Company had or was arranging to purchase the Baird, and Grening said that Ellison was the representative of Chester Import, that he appointed the officers of the vessel, gave orders for work to be furnished her, and that the vessel was intrusted in that area to himself and Ellison. Grening stated that the agreement to purchase bound Ellison (Chester Import) to pay for work done on the Baird and that Ellison had no authority to bind the vessel. Finally, he said that no one representing libellant ever inquired of him as to Ellison's authority to pledge the vessel's credit and that, if anyone had asked, he would have informed him that Ellison had no such authority. It is upon this testimony that claimant bases its contention that libellant acquired no maritime lien for the 1950 work because Ellison, who ordered the services, was without authority to subject the Baird to a repairman's lien and that such asserted lack of authority could readily have been discovered by libellant, who made no effort to do so. The pertinent statutory provisions are printed in the footnote.[8]

The district court agreed with claimant's position. It found as to the 1950 phase of the case that those who or-

---

in Thames Towboat Co. v. The Francis McDonald [254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245], under which contracts for the construction of entirely new ships are classed as nonmaritime, or to apply it to agreements of uncertain intendment— reasonable doubts concerning the latter should be resolved in favor of the admiralty jurisdiction. Nor do we think that in cases like the instant one any refined distinction should be made between reconstruction and repairs—the latter word, as used in the statute has a broad meaning." 258 U.S. 96, 99–100, 42 S.Ct. 243, 244.

7. It is worth noting the Congressional definition of the word "vessel." "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3 (1952).

8. "Maritime Liens for Necessaries
"§ 971. Persons entitled to lien
"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.
"§ 972. Persons authorized to procure repairs, supplies, and necessaries
"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master,

dered the services were without authority to pledge the credit of the vessel, that libellant made no investigation as to the authority of those who requested its services, and that casual inquiry would have disclosed that Ellison did not own the vessel and had no authority to bind her.

■ But Grening, himself an owner of the vessel, and Ellison, a prospective purchaser, were intrusted with the vessel, and Section 972 of the Ship Mortgage Act says that any person to whom the management of the vessel is intrusted in the port of supply shall be presumed to have authority from the owner to procure repairs.[9] Thus, at that point, libellant made out a prima facie case, and the burden to rebut it shifted to claimant. Relying on the proviso to Section 973,[10] claimant says that that burden was satisfied because it proved that Ellison had no authority to bind the vessel and that libellant would have discovered that fact had it made any inquiry and that it is bound by what it could have discovered but did not.

■■ We disagree because we think claimant's evidence as to Ellison's asserted lack of authority was not of the kind required in order to defeat a maritime lien for services rendered on the order of one presumptively authorized by the statute to do so. Two lines of cases have developed construing the proviso to Section 973. One holds that if the instrument relied upon to qualify the authority of the orderer to pledge the credit of the vessel contains explicit language denying him that authority, then the would-be lienor loses, if reasonable inquiry by him would have led to discovery of the instrument.[11] The other line of cases holds that if the qualifying instrument merely provides that the orderer will himself pay all charges and save the owner harmless from all liens or expenses caused by liens, then the lienor wins even if he has not been assiduous to discover the instrument.[12] The rule, therefore, appears to be that, while the repairman is charged with notice of all that reasonable diligence would have disclosed, he is not defeated unless the orderer is explicitly denied authority to bind the vessel.[13] Accepting claimant's evidence at face value, it establishes no such explicit denial of authority. Grening

---

or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"§ 973. Notice to person furnishing repairs, supplies, and necessaries

"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." 41 Stat. 1005 (1920), 46 U.S.C.A. §§ 971–973.

9. Id. § 972.

10. " * * * but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." Id. § 973.

11. United States v. Carver, 1923, 260 U. S. 482, 43 S.Ct. 181, 67 L.Ed. 361.

12. The South Coast, 1920, 251 U.S. 519, 40 S.Ct. 233, 64 L.Ed. 386; Dampskibs-selskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197.

13. "We are of the opinion that it would thwart the purpose of the statute to compel the material-man furnishing supplies to the vessel to resolve the ambiguities which may be found in such charters as those here involved. The

made the sweeping statement that Ellison had no authority to bind the vessel, but it was perfectly clear that his basis for that broad assertion was his understanding of an agreement which he said had been entered into by United Boat Service Corporation and Chester Import Company under which the latter was going to purchase the Baird. He testified that that agreement bound Chester Import Company, headed by Ellison, to make repairs and acquire supplies at its own expense. Grening said that this agreement "probably was" written, but that he had never seen it, having been told about it by someone from United Boat Service. It is not even contended that this agreement was on file in the Custom House. This oblique reference to a written agreement, limiting Ellison's authority, does not aid the claimant in the absence of the agreement itself, for if such a written agreement did exist, the failure of claimant to produce it leaves the court in complete darkness as to its terms, except for the testimony of Grening concerning it. Giving Grening's testimony the greatest possible weight, it means that under the agreement Ellison had no explicit authority to bind the vessel and, further, that he (or Chester Import) was personally liable for services ordered for the vessel.[14] But that is exactly the kind of language which The South Coast, 1920, 251 U.S. 519, 40 S.Ct. 233, 64 L.Ed. 386, and Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197, held to be insufficient to defeat the presumptive authority to bind the vessel granted by the statute. If the owner would protect his vessel

against liens by repairmen, all he need do is provide in the charter party, mortgage, or agreement for sale that the creation of maritime liens is prohibited. It has not been shown here, by the one who had the burden to show it, that any such clear prohibition to create liens existed. Consequently, libellant is entitled to a maritime lien for the 1950 services.

▪ Libellant did not waive its lien by relying on Ellison's credit in addition to that of the Baird. 41 Stat. 1005 (1920), 46 U.S.C.A. § 971; Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., supra. Nor was it guilty of laches in prosecuting its claim. The Everosa, 1 Cir., 1937, 93 F.2d 732.

▪ Libellant's 1951 work began on March 19 and was performed pursuant to Ellison's order of March 17. On March 12, 1951, the Baird was sold by United Boat Service Corporation to one Rex Murdock, who is the president of Chesport, Ltd., the present claimant. On March 16, 1951, Murdock sold the vessel to Chesport and took a mortgage on her. The mortgage was recorded in the Custom House in New York city on March 16, the day before Ellison ordered the work and three days before it began, but the mortgage was not discovered by libellant because no search was made. Being a matter of record in the Custom House of the vessel's home port, where the work was done, libellant was charged with notice of its terms. Therefore, says claimant, there is no lien for the 1951 work because the terms of the mortgage deny authority to bind the vessel. Grening's testimony does not bear on the 1951 work because

statute was intended to afford the material-man a reasonably certain criterion. The owner has a simple and ready means of protection. All that it is necessary for him to do, as the material-man in dealing with the charterer is charged with notice of the charter, is to provide therein that the creation of maritime liens is prohibited. When the owner does not do so, he should not be heard to complain when it appears that it is the charterer's business to obtain sup-

plies to keep the vessel on her way and the charter has not prohibited reliance upon the credit of the vessel." Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 280–281, 60 S.Ct. 937, 943, 84 L.Ed. 1197.

14. Grening's testimony as to the terms of the agreement, whether that agreement was written or oral, was clearly objectionable. No objection having been made, however, at the time it was offered, we will consider it.

he had left the vessel, but there is nothing to indicate that Ellison's relationship to the Baird had changed at all, so that libellant's prima facie case covers the 1951 services, too. The mortgage provides that " * * * the Owner has no right, power or authority to create or impose or to suffer or permit to be imposed or created any charge or encumbrance * * * superior or which might be deemed superior to the lien of this mortgage." We think that Morse Drydock & Repair Co. v. Steamship Northern Star, 1926, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082, is dispositive of this phase of the case. The language of the mortgage in that case was almost identical with that of the mortgage here, and the Supreme Court said that the most that such terms could do was postpone the repairman's lien to that of the mortgage, if it was a "preferred mortgage." The Court went on to hold that even though the mortgage was recorded in the Custom House as required by the Ship Mortgage Act,[15] it was not a "preferred mortgage," within the meaning of the Act and, thus, could not defeat the repair lien, because it was not endorsed on the vessel's documents as required by Section 922.[16] In our case the mortgage was recorded with the collector of customs, but it was not shown to have been endorsed upon the Baird's documents. Those documents were not produced by the claimant, whose burden it was to do so if it was to have advantage of the Act. The mortgage relied upon by claimant thus was neither a bar to the creation of the lien nor did it take preference over the lien.

The judgment of the district court will be reversed and the cause remanded for the entry of judgment consistent herewith.

15. 41 Stat. 1000 (1920), 46 U.S.C.A. §§ 921 and 922(a) (2).

16. "§ 922. Preferred mortgages

"(a) A valid mortgage which at the time it is made, includes the whole of any vessel of the United States * * * shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subdivision, the preferred status given by the provisions of section 953 of this title, if—

"(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;

"(2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;

\*　　\*　　\*　　\*　　\*

"(b) Any mortgage which complies in respect to any vessel with the conditions enumerated in this section is hereafter in this chapter called a 'preferred mortgage' as to such vessel."

"§ 953. Preferred maritime lien; priorities; other liens

"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; * * *.

"(b) * * * except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court." Id. §§ 922 and 953.