FRANK B. HALL & CO., INC., Plaintiff,

v.

S.S. SEAFREEZE ATLANTIC et al., Defendants.

No. 75 Civ. 6166–CSH.

United States District Court,
S. D. of New York.

Nov. 23, 1976.

Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, for plaintiff.

Walsh & Levine, New York City, for defendants State Street Bank & Trust Co. and Central Bank of Argentina.

**1206**

## MEMORANDUM AND ORDER

HAIGHT, District Judge:

This case requires consideration of the boundaries of admiralty jurisdiction. The channels in these jurisprudential waters are not always buoyed with complete certainty.

Plaintiff Frank B. Hall & Co., Inc. ("Hall") is an insurance broker, dealing, among other matters, in the placement of policies of marine insurance. Hall commenced this action against the S.S. SEAFREEZE ATLANTIC, the corporate shipowner, its corporate affiliates, their individual principals, and both the record and beneficial mortgagee of the ship. The last two defendants are State Street Bank & Trust Co. and the Central Bank of Argentina. The latter bank, which is foreign, is the beneficial mortgagee of the vessel, and in accordance with United States law it gave the mortgage to the former bank, a United States bank, as trustee.

Hall sues to recover the amount of $24,-185.54 which it advanced in premiums in order to avoid the cancellation of a policy of insurance covering the SEAFREEZE ATLANTIC. Hall alleges that its claim falls within the admiralty jurisdiction. That is the only jurisdictional basis pleaded in the complaint.

Defendants State Street Bank & Trust Co. and Central Bank of Argentina move pursuant to Rule 12(b)(1), F.R.C.P., for an order dismissing the complaint for lack of admiralty jurisdiction.

The Court grants the motion made on behalf of the defendant banks; and, in the light of the facts revealed by the motion papers, dismisses the complaint as against all defendants, *in rem* and *in personam*.

## I.

It appears without contradiction from the motion papers that the SEAFREEZE ATLANTIC was built by American Export Lines under an experimental program, with the aid of a federal subsidy, pursuant to the Fishing Fleet Improvement Act, 46 U.S.C. §§ 1401–1413. Designed to catch, freeze and package fish, the SEAFREEZE AT-LANTIC was built at a cost of $6,000,000, and was commissioned in 1969.

The vessel went on seven voyages. American Export Lines found her to be commercially inoperable. The SEAFREEZE ATLANTIC was docked and decommissioned in April, 1971. It appears that she has never sailed again, at least on a commercial voyage. The vessel has been berthed at Norfolk, Virginia at least since April, 1974, and possibly since her decommissioning in 1971. The SEAFREEZE ATLANTIC still lies at her berth in Norfolk.

The defendant banks became involved with the SEAFREEZE ATLANTIC in April of 1974, when Central Bank of Argentina funded a purchase of the vessel for $1,125,-000. The purchaser-mortgagor was defendant Transatlantic Fishing Corporation, which purchased from American Export Lines all of the stock of defendant American Stern Trawlers, Inc., a then subsidiary of American Export Lines, and the former owner of the SEAFREEZE ATLANTIC. Defendant World Trade Chambers, Inc. is apparently affiliated with Transatlantic Fishing Corporation, although the precise corporate relationship is not clear; nor is its understanding essential to disposition of this jurisdictional motion.

The new owners of the SEAFREEZE ATLANTIC hoped to free her from legal restrictions governing her use, possibly sell her to a foreign buyer, but in any event to restore the vessel to commercial operation. The fact of the matter is that the new owners have never succeeded in that aim, and, as noted above, the SEAFREEZE AT-LANTIC still languishes at her berth in Norfolk. She is now well into the sixth year of her idleness; and there is no present indication of when, if ever, her present owners may be able either to reactivate the vessel, or sell her to other interests who will restore her to operation.

In April of 1974, Hall was retained as an insurance broker to effect a policy of insurance upon the hull and machinery of the SEAFREEZE ATLANTIC. The advice of insurance [1] reflects that, as of April 25, 1974, Port Risk insurance attached on the SEAFREEZE ATLANTIC, such insurance

1. Exhibit 1 to affidavit of Frank C. Mason, verified March, 30, 1976.

to remain in effect "until time of sailing". The assureds were identified as:

"American Stern Trawlers, Inc., and Trans-Atlantic Fishing Corporation and State Street Bank & Trust Company, Mortgagee."

The same parties are identified as the loss payees, "as their respective interests may appear, or order."

It appears that the monthly premiums on this policy were paid from April, 1974 until February 15, 1975. No premium payments were made from February 15, 1975 until August 1, 1975. The underwriters, understandably enough, threatened to cancel the policy for non-payment of premiums. The manner in which Hall came to advance the premiums which form the subject matter of the present suit is stated in the affidavit of Mr. Frank Mason, Hall's Vice-President:

"In order to avoid cancellation of the policy which covered the interests of both the Owner and the Bank, Frank B. Hall & Co., Inc., as broker, advanced the premiums, in a total amount of $24,185.54."

Hall contends that, as the result of communications between itself and the defendant Central Bank of Argentina at these particular times, and in all the circumstances of the case, the bank is legally obligated to repay Hall for these premiums, advanced by Hall as broker to avoid cancellation of the policy. The defendant banks deny any such obligation. The Court intimates no view on the merits of the dispute. The Court, on this motion, is concerned solely with the question of jurisdiction, which arises against the factual background summarized above.

## II.

Since the founding of the Republic, the federal courts have been endowed with ad-miralty jurisdiction;[2] but the precise boundaries of that jurisdiction, undefined either by the Constitution or applicable statutes, have given rise to considerable litigation. There are some surprises. Thus contracts which one might expect to be within admiralty jurisdiction have been held to fall outside the jurisdiction. Examples include contracts for the building and sale of vessels; for the payment of a fee for procuring a charter; and for services to a vessel laid up and out of navigation. See, generally, the discussion in Gilmore & Black, *The Law of Admiralty* (2nd Ed. 1975) at pp. 18–31. These authors summarize the jurisdictional situation:

"The resultant conception of our admiralty jurisdiction has been one of fairly complete coverage of the primary operational and service concerns of the shipping industry, with a few anomalous exceptions." p. 22.

Whether or not a case falls within the admiralty jurisdiction has important practical consequences to the litigants. If a case is admiralty in nature, the federal courts have jurisdiction, without regard to diversity of citizenship or the amount in controversy. There is no trial by jury in the admiralty. Special remedies exist for attachment of the defendant's assets prior to judgment.[3]

It is quite clear that, whatever vagaries appear in the development of the boundaries of admiralty jurisdiction, if a case falls outside those boundaries the court, whose admiralty jurisdiction was wrongly invoked, is bound to dismiss the action.

We turn to the application of this jurisdictional principle to the facts of the case at bar.

---

**2.** The Constitution, Art. III, § 2, extends the "judicial power of the United States" to "all cases of admiralty and maritime jurisdiction." 28 U.S.C. § 1333(1), derived from the Judiciary Act of 1789, provides:

"... the district courts ... shall also have exclusive original cognizance of all civil causes of admiralty and maritime juris-diction ... saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it; ..."

**3.** Supplemental Rules for Certain Admiralty and Maritime Claims, effective July 1, 1966, especially Rule B.

### III.

Defendants claim that admiralty jurisdiction is lacking in the case at bar for two reasons, either of them sufficient to require dismissal:

1. At the pertinent times the SEAFREEZE ATLANTIC had been withdrawn from navigation for an indefinite future time. She is characterized, in this regard, as a "mothballed" vessel.

2. A claim arising out of a contract to procure insurance, albeit maritime, is not a maritime contract.

Plaintiff argues in response:

1. The SEAFREEZE ATLANTIC should not be regarded as "mothballed", since "it has been the express position of the vessel owner defendant that constant efforts are being made to obtain financing and to return the SEAFREEZE ATLANTIC to commercial operation."[4]

2. The claim at bar should be regarded as arising out of a contract of marine insurance, and not a contract to procure insurance.

These disputes are discussed in order.

The "mothball" concept is introduced by Professor Moore's observation that:

". . . insurance on a 'mothballed' vessel withdrawn from navigation for an indefinite future time should also be beyond the jurisdiction of the admiralty, since the relationship to maritime commerce or navigation is, at best, remote." 7A *Moore's Federal Practice* (1976) at ¶ .255[1], p. 3024.

While Moore cites no authority for the exclusion from admiralty jurisdiction of insurance on "mothballed" vessels the proposition is in accord with the general rule that admiralty is limited to vessels actually in navigation, or only temporarily withdrawn from that state of commercial grace. Where the facts indicate that a vessel has been indefinitely withdrawn from navigation, she is also regarded as withdrawn from admiralty jurisdiction, and services rendered to her in that state do not give rise to maritime liens.

The principle is illustrated by contrasting *Murray v. Schwartz*, 175 F.2d 72 (2d Cir. 1949) with *Hercules Co. v. Brigadier General Absolom Baird*, 214 F.2d 66 (3rd Cir. 1954). In *Murray* a lien for wharfage was asserted against a vessel which, at the time of the services, lacked proper documentation; whose propelling machinery, pumps and lights were inoperable; and which needed extensive repairs before she could sail. The Second Circuit, characterizing the vessel as a "dead ship", said in affirming the district court's dismissal for lack of jurisdiction:

"A wharfage contract touching a dead ship is not maritime, and a contract which is not maritime cannot create a lien subject to the jurisdiction of admiralty. *Poznan*, 2 Cir., 9 F.2d 838, 842–843; Robinson, Admiralty, 180." 175 F.2d at 72–3.[5]

By way of contrast, *Hercules Co.* involved repairs to a vessel for the purpose of "readying her for a sealing voyage." The shipowner contested admiralty jurisdiction

---

4. This statement is taken from plaintiff's brief, at p. 7. No affidavits are submitted by the vessel owner to show the present status, if any, of these proclaimed efforts.

5. In *Poznan*, 9 F.2d 838, 843 (2d Cir. 1925), followed by the Second Circuit in *Murray*, the following apt discussion appears:

"In Hughes on Admiralty (2d Ed.) 22, it is said: 'The same transaction may be maritime in one case and not maritime in another. As emphasizing this distinction, there is the maxim that "a ship is made to plough the seas, and not to lie at the walls." Hence wharfage rendered to a ship while loading or unloading, or in her regular use as a freight-

earning enterprise, is a maritime contract. On the other hand, wharfage to a ship laid up for the winter while waiting for the season to open is not maritime.'

"The same distinction is illustrated by the cases which hold that watchmen on a vessel while in port during voyages are regarded as serving under a maritime contract, but those who have charge of her while laid up have no such contract. *Erinagh* (D.C.) 7 F. 231; *Fortuna* (D.C.) 206 F. 573; Hughes on Admiralty (2d Ed.) 22. And if a vessel is laid up for the season, or for any reason is withdrawn from navigation a contract for wharfage is regarded as a nonmaritime one. Benedict's Admiralty (5th Ed.) vol. 1, § 66."

on the grounds that, at the time the services were rendered, the vessel was not actually engaged in marine commerce and navigation, and was not fully documented, lacking a certificate of inspection. The Third Circuit declined, on those facts, to regard the vessel as a "dead ship" or withdrawn from commerce:

> "If the Baird ever was withdrawn from navigation and maritime commerce, she was returned to those pursuits when her owners and would-be owners began putting her in shape for an intended voyage, which in fact took place in April of 1951, libellant's services being largely responsible for her ability to depart on that voyage." 214 F.2d at 69.

While each case turns on its own facts, I conclude that the condition of the SEAFREEZE ATLANTIC in August, 1975, when Hall advanced the monies to pay the insurance premiums, more closely resembles that of the vessels involved in *Murray v. Schwartz* and *Poznan* than it does the condition of the sealing vessel in *Hercules Co.*, being readied by her owners for an intended voyage. When Hall advanced the monies for these premiums, the SEAFREEZE ATLANTIC had been lying idle at her berth for over four years; a number of fishing seasons had come and gone without any commercial or navigational activity by the vessel; and there was no prospect, at that time, of the vessel's return to commerce or navigation. The best evidence of the latter proposition is found in the fact that, as of this day, the vessel continues to lie idle at her berth, with no competent evidence demonstrated to the Court to show an imminent change in status. The SEAFREEZE ATLANTIC is quite clearly a "vessel withdrawn from navigation for an indefinite future time", in Moore's phrase; and I agree with his conclusion that insurance policies on such a vessel, and the premiums related to those policies, fall beyond the jurisdiction of the admiralty.

While the resolution of this question furnishes sufficient basis to dismiss the complaint, the Court also agrees with defendants' second contention, namely, that the implied contractual obligations upon which Hall relies are not maritime in nature.

It is well settled that "contracts and agreements to *procure* marine insurance on vessels and their cargoes are not maritime and, consequently, are outside the admiralty jurisdiction." Moore, op. cit. *supra*, at para. .255[2], p. 3025. It is equally well settled that suits for recovery of indemnity or premiums on marine insurance policies are within admiralty jurisdiction. Gilmore & Black, op. cit. *supra*, at p. 22. The question presented by the case at bar is whether Hall's actions, and the implied obligations which are alleged to arise therefrom, more closely resemble the first or second line of cases.

Hall argues that this issue should be resolved in its favor on the authority of *Stanley T. Scott & Co., Inc. v. Makah Development Corp.*, 496 F.2d 525 (9th Cir. 1974). In that case, the plaintiff insurance broker, at shipowner's request, obtained underwriters who subscribed marine insurance policies for the owner's fishing fleet. The broker advanced the necessary premiums, and sued the shipowner when those premiums were not paid. A majority of the Ninth Circuit panel which heard the case held that the broker's "implied-in-law contractual right to reimbursement for the premiums is integrally related to the marine insurance policy", and accordingly sustained admiralty jurisdiction. 496 F.2d at 526. Judge Wallace's dissent criticized the majority as having "needlessly expanded federal jurisdiction to encompass a suit on a contract to procure marine insurance, a cause of action which has never been within the admiralty jurisdiction." 496 F.2d at 526. After an extensive review of the pertinent authorities, Judge Wallace observes that:

> ". . . many other district and circuit courts have so consistently held that a contract to procure marine insurance is not within admiralty jurisdiction that one would have thought that the rule was as well settled as any black letter rule out of a hornbook." 496 F.2d at 526.

Considering the geographic location in which this Court finds itself, I may choose between the majority and minority views in the *Scott* case. I prefer, and consequently apply, the reasoning of the dissent, which I regard, with respect, as more consistent with established authority. This conclusion furnishes an alternate basis for dismissing the complaint in the case at bar, since the payment of premiums by a broker to avoid a threatened cancellation of an insurance policy is clearly a payment for the purpose of procuring future coverage.[6]

### IV.

For the foregoing reasons, the Court concludes that the motion of the defendant banks to dismiss the complaint, for lack of admiralty jurisdiction, must be sustained.

While the present motions were put forward only on behalf of the defendant banks, it is also the fact that admiralty jurisdiction is the only jurisdictional basis alleged in the complaint. Admiralty jurisdiction, lacking as to the defendant banks, is equally lacking, in the circumstances of the case, as to all other defendants. Accordingly, the complaint is dismissed, as to all defendants, for want of jurisdiction.

It is So Ordered.

---

**6.** Even if I were inclined to follow the majority decision in *Scott*, it would not salvage the complaint in the case at bar. That is because, as noted *supra*, the SEAFREEZE ATLANTIC had been withdrawn from navigation at the time of Hall's advances. In those circumstances the vessel, and all contracts relating to her, are beyond admiralty jurisdiction. That question did not arise in *Scott*, where the policies in question apparently covered an *operating* fishing fleet.