104 F.3d 1158
 1997 A.M.C. 609, 62 Cal. Comp. Cases 42,
97 Cal. Daily Op. Serv. 344,
97 Daily Journal D.A.R. 533
 ROBERT E. BLAKE INC., dba General Engineering and Machine
Works, Third-party-plaintiff-Appellant,
v.
EXCEL ENVIRONMENTAL, Third-party-defendant-Appellee.
 Nos. 94-16597, 95-16171.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 11, 1996.
Decided Jan. 14, 1997.
 
 James D. Boughey, Ginger M. English, Boughey, Garvie & Bushner, San Francisco, California, for the third-party-plaintiff-appellant.
 Andrew P. Sclar, Ericksen, Arbuthnot, Kilduff, Day & Lindstrom, San Francisco, California, for the third-party-defendant-appellee.
 Appeals from the United States District Court for the Northern District of California, Vaughn R. Walker, District Judge, Presiding. D.C. No. CV-92-04779-VRW.
 Before: HALL and BRUNETTI, Circuit Judges, and WEINER,* District Judge.
 BRUNETTI, Circuit Judge:
 
 
 1
 In the fall of 1990, the United States hired Robert E. Blake, Inc., d/b/a General Engineering & Machine Works ("Blake"), to repair and activate the S.S. Cape Bover which at that time was part of the United States Ready Reserve Fleet and was in storage at the Oakland Army Base. Blake, as general contractor, subcontracted Excel Environmental, Inc. ("Excel"), for asbestos abatement, carpentry, painting, and insulation repair services. On December 15, Excel employee John J. Pollock was injured while working aboard the Cape Bover. Pollock filed suit against Blake which in turn sought indemnification by Excel in a third party complaint. Blake relies on an indemnification clause contained on the back of an unsigned purchaser order which Blake issued to Excel prior to Excel's performance.
 
 
 2
 The Cape Bover had been out of service for several years as of 1990. Upon inclusion in the ready reserve fleet, a number of steps are taken to protect the ships. For example, hatches and other exterior openings are sealed to protect against the weather and dehumidification, cathodic protection, and fire and flooding alarm systems are installed. When vessels in the Ready Reserve Fleet are reactivated they must successfully complete sea trial and pass a United States Coast Guard inspection. One of Blake's employees described the Cape Bover as a "dead ship" at the time the contract was formed.
 
 
 3
 In November of 1990, Excel approached Blake and offered to perform the insulation repair work. On December 4, 1990, Blake was instructed to begin reactivation of the Cape Bover. Blake then proceeded to hire subcontractors, awarding the insulation project to Excel. On or about December 8, the ship successfully engaged in sea trials. The accident occurred on December 15, 1990. The parties agree that Pollock initially received benefits under the California Workers' Compensation Act, Cal.Lab.Code § 3200 et seq. (West 1989), for about nine months, and then subsequently received higher benefits under the Longshore & Harbor Workers' Compensation Act, 33 U.S.C. § 903 (1986).
 
 
 4
 The district court ruled that the contract was governed not by admiralty law but by state law because the Cape Bover was a dead ship at the time Excel and Blake reached agreement. Applying Cal.Lab.Code § 3864, an anti-indemnification statute which requires an executed written agreement, the district court concluded that Blake's third party complaint was barred and granted summary judgment to Excel. The court also awarded attorneys' fees pursuant to a provision in the purchase order and California law.
 
 
 5
 Blake appeals both the summary judgment order and the award of attorneys' fees. It argues that summary judgment was inappropriate because the contract was governed by admiralty law, not California law, and it argues the award of attorneys' fees was improper because they were not awarded in the summary judgment order. We review grants of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995).
 
 I.
 
 6
 "A contract is within admiralty jurisdiction if its subject matter is maritime." Royal Ins. Co. of America v. Pier 39 Ltd., 738 F.2d 1035, 1036 (9th Cir.1984). "A generalized test is not very useful in deciding actual cases because many contracts with a pronounced maritime flavor have been held not within the jurisdiction." Id. It is generally agreed, however, that a contract to repair a ship is governed by admiralty law while a contract to build a ship is not. Id. Contracts for services to a vessel laid up and withdrawn from navigation, i.e. a "dead ship", are also not governed by admiralty law. Goodman v.1973 26 Foot Trojan Vessel, 859 F.2d 71, 73 (8th Cir.1988); Keene Corp. v. United States, 700 F.2d 836, 844 (2d Cir.1983); Murray v. Schwartz, 175 F.2d 72, 72-73 (2d Cir.1949); Frank B. Hall & Co. v. S.S. Seafreeze Atlantic, 423 F.Supp. 1205, 1208 (S.D.N.Y.1976); G. Gilmore and C. Black, The Law of Admiralty 26 (2d ed. 1975). See also Dean v. United States, 418 F.2d 1236, 1237 (9th Cir.1969) (discussing dead ship doctrine in the context of the warranty of seaworthiness). It is the health of the ship at the time the contract is formed that is determinative. Goodman, 859 F.2d at 73.
 
 
 7
 The Cape Bover was a dead ship at the time Excel and Blake formed their contract. See American Eastern Dev. Corp. v. Everglades Marina, 608 F.2d 123, 125 (5th Cir.1979); Seafreeze, 423 F.Supp. at 1208-09. Because the Cape Bover had been stored for "several years" and had been deactivated, the vessel was withdrawn from navigation and thus admiralty jurisdiction as well. See, e.g., Murray, 175 F.2d at 73; Seafreeze, 423 F.Supp. at 1208. At the time the contract was formed, the ship was still withdrawn and thus the contract and the reactivation work were outside admiralty law. See Goodman, 859 F.2d at 73 (status of ship at time of contract formation is determinative). As the factual history of the Cape Bover is not disputed, summary judgment was appropriate. Warren, 58 F.3d at 441 (summary judgment appropriate when there are no genuine issues of material fact).
 
 
 8
 In Murray, a former United States Maritime Commission ship laid idle for several years. 175 F.2d at 72, rev'g Murray v. The Meteor, 78 F.Supp. 637, 638 (E.D.N.Y.1948). In 1947 it was purchased from the government and towed to New York City. The Second Circuit held that the ship was still dead because her pumps were deactivated, her engine was inoperable, and she lacked proper documentation. 175 F.2d at 72. In Everglades, the Fifth Circuit reasoned that in assessing whether a ship has been withdrawn from navigation, it considers the ship's pattern of use. 608 F.2d at 125. Noting that dry-storage at a marina allowed easy access to the water, the court concluded that the storage did not amount to a withdrawal from navigation. Id. at 124-25.
 
 
 9
 In Seafreeze, a commercial fishing vessel was decommissioned after seven voyages and remained berthed in the same port for between two years and five years. 423 F.Supp. at 1206. The court concluded that as the ship had been indefinitely withdrawn from navigation, admiralty law did not govern the contractual claim. Id. at 1208. It emphasized the lack of activity for more than four years as well as the lack of prospects that the ship would return to commerce. Id. at 1209.
 
 
 10
 A ship that has been unused for several years and has been mothballed such that it needs to successfully complete sea trials and pass a Coast Guard inspection falls under the umbrella of the dead ship doctrine. Like the vessel in Seafreeze, the Cape Bover was inactive for several years and was indefinitely withdrawn from navigation. 423 F.Supp. at 1206. As a ship in the Ready Reserve Fleet, its hatches and other opening were sealed for protection against weatherization, a dehumidification system was installed, and most importantly the ship lay dormant. This pattern of use is clearly inconsistent with regular maritime activity. See Everglades, 608 F.2d at 124-25. Thus the Cape Bover was a dead ship in the fall of 1990, the time at which the contract was formed, because it had been withdrawn from navigation.
 
 
 11
 While there is little case law on whether the decision to reactivate by itself breathes life into a dead ship, the weight of authority suggests it does not. As contracts for services to dead ships are not within admiralty jurisdiction, the mere decision to reactivate is insufficient to confer admiralty jurisdiction because the ship at that time is still inoperable and thus still withdrawn from navigation. See, e.g., Goodman, 859 F.2d at 73 (wharfage contract for inoperable ship not maritime); Murray, 175 F.2d at 72-73 (wharfage contract for inoperable ship not maritime). See also Stark v. United States, 413 F.2d 253, 253 (5th Cir.1969) (concluding, in the course of analyzing seaworthiness, that naval ship undergoing reactivation was still a dead ship). In Seafreeze, the court did note the lack of prospects that the ship would return in concluding that it was withdrawn from navigation. 423 F.Supp. at 1209. However, there is little question here that the Cape Bover ship was indefinitely withdrawn from navigation.
 
 
 12
 Latus v. United States, 277 F.2d 264, 265-66 (2d Cir.1960), and West v. United States, 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed.2d 161 (1959), also tend to support the notion that reactivation contracts are not governed by admiralty law. The district court relied heavily on Latus, in which the Second Circuit held that a mothballed ship does not warrant her seaworthiness even during the period in which she is being reactivated. 277 F.2d at 265-66. In Latus, a painter was injured five days before reactivation work was completed. Id. In West, the Supreme Court held that a mothballed naval ship undergoing reactivation did not imply a warranty of seaworthiness. 361 U.S. at 122, 80 S.Ct. at 192. The Court focussed on the extensive work needed for the vessel to be reactivated. Id.
 
 
 13
 The persuasiveness of both cases is limited because they analyzed whether the vessels were seaworthy not whether they were dead ships for jurisdiction purposes. West, 361 U.S. at 122, 80 S.Ct. at 192; Latus, 277 F.2d at 266. The questions of jurisdiction and seaworthiness are largely distinct in that the focus in the dead ship doctrine is on the intentional withdrawal of the ship from navigation as opposed to whether the ship's condition makes it unnavigable or unseaworthy. See, e.g., West, 361 U.S. at 122, 80 S.Ct. at 192; Goodman, 859 F.2d at 73. Nevertheless, there is some support for viewing the two questions as related. Cf. Hollister v. Luke Constr. Co., 517 F.2d 920, 921 (5th. Cir.1975) (holding that because a contract to build a ship is nonmaritime, a tort stemming from construction must also be nonmaritime). Ultimately, seaworthiness case law is relevant to the dead ship doctrine because they both suggest that contracts to reactivate mothballed naval ships are not governed by admiralty law. See West, 361 U.S. at 122, 80 S.Ct. at 192. See also McKinley v. All Alaskan Seafoods, Inc., 980 F.2d 567, 571 (9th Cir.1992) (relying on West in holding ship undergoing major reconstruction was not in navigation for the purposes of the Jones Act).
 
 
 14
 Blake emphasizes the imminent plans to reactivate the Cape Bover at the time the contract was formed and relies on Hercules Co. v. Brigadier General Absolom Baird, 214 F.2d 66, 69 (3rd Cir.1954). In Hercules, the plaintiff sought a maritime lien for unpaid repair work. The court rejected the defendant's contention that the ship was a dead ship, based on the lack of a finding that the ship had ever been withdrawn from navigation. Id. It further stated that even if the ship was withdrawn from navigation, the act of preparing her for an upcoming voyage returned the vessel to maritime commerce. Id. As the Hercules court found that the ship was never withdrawn from navigation, this statement was dicta. We are not persuaded that the mere decision to reactivate a dead ship is sufficient to subject all subsequent contracts to admiralty law.
 
 II.
 
 15
 As state law governs the contract, Blake's third party complaint is barred. Section 3684 provides:
 
 
 16
 If an action as provided in this chapter prosecuted by the employee, the employer, or both jointly against the third person results in judgment against such third person, or settlement by such third person, the employer shall have no liability to reimburse or hold such third person harmless on such judgment or settlement in absence of a written agreement so to do executed prior to the injury.
 
 
 17
 Cal.Lab.Code § 3864 (West 1989). Because the purchase order was never signed by Excel, Section 3864 renders the indemnification clause ineffective.
 
 
 18
 Blake attaches great importance to the fact that Pollock ultimately received disability payments under the Longshore & Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 903 (1986). According to Blake, Section 3864 is inapplicable because the benefits were received under the LHWCA and thus there was no "action as provided in this chapter." Blake's argument would be more persuasive were it not for the fact that payments were initially made under the California Workers Compensation Act ("CWCA") and thus were pursuant to "an action as provided in this chapter." Id. That the payments were later made under the LHWCA does not change the fact that the initial action was under the CWCA.
 
 
 19
 Furthermore, the change to the LHWCA does not affect the question of whether admiralty law or California law governs the contract. See 33 U.S.C. § 903. The LHWCA is expressly applicable to disabilities sustained on navigable waters which it defines as including injuries occurring in dry dock during the building of a vessel. 33 U.S.C. § 903(a). As it is well-settled that a contract to build a ship is not within admiralty jurisdiction, the mere fact that the LHWCA may provide compensation to an injured worker does not compel the conclusion that admiralty law governs the contract under which that employee was working. See Royal Ins. Co. of America, 738 F.2d at 1036.
 
 III.
 
 20
 In attacking both the award of attorneys' fees and the grant of summary judgment, Blake argues that the district court lacked jurisdiction over the matter after determining that admiralty law did not govern the contract. Blake, though, continues to concede that the original complaint filed by Pollock was in admiralty. Thus as the third party complaint against Excel alleged that the indemnity claim arose out of the same transaction or occurrence as Pollock's claims, supplemental jurisdiction was appropriate. 28 U.S.C. § 1367.
 
 
 21
 Blake's primary argument is that the district court cannot find both that the contract was not governed by admiralty law but that Pollock's complaint was. Tort and contract claims, however, face different tests in establishing admiralty jurisdiction. Hercules, 214 F.2d at 68. "[W]hile admiralty jurisdiction in tort depends upon locality, admiralty jurisdiction in contract depends upon the presence of a maritime favor in the subject matter of the contract." Id. Thus it is was not inherently contradictory to find admiralty jurisdiction for Pollock's tort claim and to also find that Blake's contract claim was governed by state law.
 
 
 22
 Moreover, Pollock's accident occurred on December 15, 1990, one week after the Cape Bover successfully engaged in sea trials. At this time, the Cape Bover was not a dead ship. However, at the time the contract was formed, the ship was still mothballed. The week-and-a-half between the formation of the contract and the accident is significant. See Goodman, 859 F.2d at 73 (status of ship at the time contract is formed is determinative). The district court's decision to exercise supplemental jurisdiction was appropriate and consistent with its summary judgment rationale.
 
 IV.
 
 23
 Blake also argues that the attorneys' fees are contract damages and are thus procedurally barred because Excel failed to raise the issue in the pleadings and the district court did not award fees as part of the judgment. Northern District of California Local Rule 270-1 allows 60 days for the filing of a motion for attorneys' fees but Blake argues that the rule does not apply to the award of attorneys' fees in state contract actions. According to Blake, Excel was required to seek an amendment of the judgment which it did not do. Blake's argument hinges on its assertion that state law cannot empower federal courts to award attorneys' fees as costs but only as damages in the judgment.
 
 
 24
 California Civil Code Section 1717(a) allows attorneys' fees to be awarded as costs whenever the contract under which the claim is asserted contains a provision for awarding attorneys' fees. Even if Blake is correct, its argument is irrelevant because the district court's judgment in fact ordered Blake to pay Excel's costs in an amount to be determined. Its later order simply clarifies the state law grounds for awarding attorneys' fees and sets the figure. Thus the fees were awarded in the judgment as costs as contemplated by Cal. Civil Code § 1717(a).
 
 
 25
 Finally Blake points to apparently contradictory language in the district court's two orders concerning the status of Pollock's claim. In the summary judgment order, the court stated Pollock's claim was under California law. In the attorneys' fees order, the district court stated that it had original jurisdiction because Pollock's claim "sounded in admiralty." Blake suggests that this later sentence requires a reversal of the summary judgment order.
 
 
 26
 As noted above, the basis for admiralty jurisdiction is different in tort and contract law. Supra at 294. Furthermore, the logical connection that Blake misses stems from the contract which is the basis for any purported right to indemnification. The contract was formed before the Cape Bover was reactivated while the injury occurred after the vessel successfully completed sea trials.
 
 
 27
 The apparent contradiction is illusory and irrelevant. Finding that the complaint invokes admiralty jurisdiction does not necessarily compel the conclusion that admiralty law governs the claim. Even if the two sentences are contradictory, the inconsistency has no legal effect. In the summary judgment order the court never held that Pollock's complaint was governed by state law because that issue was not before the court as Pollock's complaint was already settled.
 
 
 28
 AFFIRMED.
 
 
 
 *
 Hon. Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation