Thomas W. TREAKLE, Jr., et al.,
Libelants,

v.

POCAHONTAS STEAMSHIP COMPANY, in personam and the STEAMSHIP CONSOLIDATION COAL, in rem, Respondents;

Norfolk and Western Railway Company, Perry Towing Corporation, and Coal Terminal Towing Corporation, Impleaded Respondents.

Thomas W. TREAKLE, Jr., et al.,
Libelants,

v.

MARINE COAL TRANSPORT CORPORATION, in personam, and the SS MARINE ELECTRIC, in rem, Respondents;

Norfolk and Western Railway Company, Perry Towing Corporation, and Coal Terminal Towing Corporation, Impleaded Respondents.

Nos. 8523, 8531.

United States District Court
E. D. Virginia,
Norfolk Division.

Oct. 4, 1967.

Henry E. Howell, Jr., Norfolk, Va., for libelants.

Joseph L. Kelly, Jr., Norfolk, Va., for N&W.

Charles R. Dalton, Jr., Norfolk, Va., for Pocahontas and Marine Coal.

Hugh S. Meredith, Norfolk, Va., for Coal Terminal.

WALTER E. HOFFMAN, Chief Judge.

## MEMORANDUM

These consolidated actions, standing on exceptive allegations to the libels (final action on which will determine the merits), raise rather novel questions in the admiralty field.

The various libelants were, during all pertinent times,[1] pilots[2] of tug boats owned and operated by Perry Towing Company and Coal Terminal Towing Corporation. The tugs were used, for the purpose of this proceeding, in assisting in the docking and undocking of oceangoing vessels at the Norfolk and Western Railway Company Coal Piers in the port of Hampton Roads. The tugs were permanently assigned to this facility. In docking and undocking it is frequently necessary to employ the motive power of the oceangoing vessel, together with its steering apparatus, along with the concurrent assistance of tugs made fast at varying positions alongside the vessel. The peculiarity of local tide conditions, and other factors in and around the docks, makes it appropriate for the ship's master to relinquish the helm to a local pilot more familiar with docking conditions. The pilot is required, in boarding a vessel, to ascend a ladder from the tug to the ship's main deck. From there he proceeds to the flying bridge where he assumes control of the navigation subject, of course, to the ultimate control of the master.

The pilots here involved differ from those who are members of the Virginia Pilot Association. The latter are engaged to bring oceangoing vessels, excluding Government vessels, to a point off the docks at the coal piers. Where the master of the oceangoing vessel is properly licensed, it is unnecessary to engage the services of a pilot from the Virginia Pilot Association to bring the vessel from Cape Henry to a point off the dock.

1. Libelants seek compensation for the period beginning January 1962, through December 1964.

2. The pilots were either captains or mates assigned to tugs working at Norfolk and Western Railway Company Coal Piers.

The pilots are required to possess special licenses. In each instance they are the masters of the particular tug employed to assist in the docking operations. The tugs are frequently referred to as "pier boats" and their activities are limited to docking [3] vessels at the Norfolk and Western Coal Piers.

Under their employment contracts with Perry Towing Company—and later with Coal Terminal Towing Corporation—the pilots, in addition to their hourly wage rate, received $8.50 per day "to cover the service of docking and undocking ships." [4] Additional compensation was likewise provided for the mates as observed in the footnote.

The pilots contend, in these actions, that the shipowners, as their secondary employer, are responsible for an individual pilotage fee for each operation when aboard the oceangoing vessel. They base their claim at the rate of $7.50 for each vessel boarded.

As between Perry and Coal Terminal on the one hand, and the shipowner on the other, the tug owners required the shipowner to assume full responsibility for the pilot's actions while aboard the vessel being docked. In recognition of the increased hazard to the entire tug crew occasioned by a greater accident exposure in docking and undocking, the entire crew received additional compensation from Perry and Coal Terminal known as a "Pier Rate."

The pilots who institute these actions were aboard the respondents' vessels solely by reason of their employment by Perry Towing Company and its successor, Coal Terminal Towing Corporation, the latter being affiliated with Curtis Bay Towing Corporation. The pilots do not contend that the additional compensation provided by Rule 6 remains unpaid. They received this compensation, together with their regular hourly rate of pay, from Perry and Coal Terminal.

It is conceded that no separate pilotage fee has ever been paid by a shipowner to a docking pilot with respect to vessels docking or undocking at any coal pier.[5]

While we feel that the special provisions of the agreement are sufficiently clear to establish the fact that the pilots never contemplated making an express or implied contract with the shipowners, we need not determine the rights of the parties by the express wording of the agreement. The evidence submitted in support of and in opposition to the exceptive allegations abundantly establishes the course of dealings between the parties and the interpretations placed

---

**3.** There are instances in which the pilot goes aboard the vessel during an undocking operation, but no references to same will be made, as the procedure is merely reversed.

**4.** The pertinent portion of the agreement under Rule 6, designated as "Rates of Pay," is as follows:

"Note 1. Masters (captains) on tugs assigned to docking and undocking ships at Norfolk and Western Railway Coal Piers will receive $8.50 for each day they work to cover the service of docking and undocking ships, in addition to their regular compensation.

"Note 2. Mates on tugs assigned to docking and undocking ships at Norfolk and Western Railway Coal Piers will receive $2.87 for each day they work to cover the service of docking and undocking ships, in addition to their regular compensation."

The wording limiting the extra compensation to masters and mates "on tugs assigned to docking and undocking ships" was taken from prior agreements between the Chesapeake and Ohio Railway Company and the union representing its employees. The Chesapeake and Ohio apparently operated some tugs which were *not* assigned to docking and undocking. The only tugs owned by Perry and Coal Terminal were always assigned to docking and undocking ships. It should be noted that the extra compensation is payable for each day the master or mate may work, and it is not governed by the number of vessels docked or undocked.

**5.** Prior to 1960, coal was carried to the port of Hampton Roads by three rail carriers; the Chesapeake and Ohio Railway Company (Newport News), the Virginian Railway Company (Norfolk), and the Norfolk and Western Railway Company (Norfolk). In 1960, the Virginian Railway and Norfolk and Western Railway merged, thereafter becoming the Norfolk and Western Railway Company.

upon the agreement. As stated in Reconstruction Finance Corp. v. Sherwood Distilling Co., 200 F.2d 672 (4 Cir., 1952):

"It is well established that the interpretation placed upon a contract by the parties themselves, before a dispute has arisen, is entitled to the greatest weight."

The service performed by the pilots is the usual and customary work done by masters of docking tugs. If there are two tugs assisting, the master of one tug boards the ship and takes control of her engines and steering for the purpose of maneuvering the vessel into or out of a berth alongside the pier. If there is only one tug involved, the master performs the same duties. He also serves in legal control of the engines and steering of the tug or tugs, in that he gives the orders to the tug.

In the port of Hampton Roads, some towing companies do not pay extra compensation to the docking master, but permit him to charge and collect a docking fee from the shipowner. However, with respect to rail carriers and towing companies operating tugs specifically and exclusively assigned to docking and undocking ships at coal piers, *extra* compensation has been allowed and paid by the rail carrier or tug company as an integral part of its labor contract. This practice has prevailed in this area for approximately 48 years.

Collective bargaining agreements have specified the flat monthly or daily rate to be paid as extra compensation for docking and undocking ships. It has not been dependent upon the number of ships actually handled. On occasions, tugs owned and operated by Curtis Bay Towing Company are used to dock and undock at the Norfolk and Western Coal Piers and these pilots are paid a pilotage fee by Curtis Bay, as they are employed under different agreements negotiated by a different union. When the Curtis Bay pilots dock and undock ships at places other than the coal piers, they are permitted to collect pilotage fees from the shipowner, but such is not permitted when docking and undocking at the coal piers.

The original collective bargaining agreement involving the pilots herein concerned was negotiated by Local No. 10 of the International Order of Masters, Mates & Pilots and Perry Towing Corporation. It was modeled after like agreements between the same Local, in behalf of masters and mates employed by the former Virginian Railway Company and that rail carrier. Prior to that time the masters and mates, then not unionized, were employed with the understanding that they would receive the same compensation as the masters and mates of the Chesapeake and Ohio Railway Company tugs; the latter group being represented by the aforesaid Local No. 10, and even before then by the National Organization.

Dependent upon the volume of business at the Norfolk and Western Coal Piers, the pilots stand to benefit or lose if permitted to collect a separate docking fee from the shipowner. Earlier agreements involving the Chesapeake and Ohio Railway Company provided for flat *extra* compensation of $90.00 per month for masters and $40.00 per month for mates "to cover the service of docking and undocking ships." There is evidence indicating that the regular pay of masters permitted to collect pilotage fees from shipowners is less than the regular pay of masters employed by Perry and Coal Terminal. There is likewise testimony tending to show that if the pilots here involved had been permitted to charge and collect pilotage fees from shipowners, they would have received in excess of the extra docking fees paid at contract rates.

Since 1957 at least, the unions [6] have continuously demanded additional *extra* compensation for docking and undocking vessels at the coal piers, including the right to charge and collect fees from shipowners. While rates of regular

6. Local No. 10 at that time. Later Local No. 9 became the bargaining representative.

compensation and other benefits have increased, the employers (Coal Terminal, Perry and its predecessor, Virginian Railway) have steadfastly refused to yield on the additional *extra* compensation for docking and undocking. The record is replete with the negotiating efforts involving pilotage fees to shipowners, to whom bills should be presented, and by whom paid. As early as 1958, the Virginian Railway advised Captain Treakle, one of the pilots maintaining this action, that "we do not agree that we can consistently agree to grant permission to our captains to present bill to ship's agents for pilotage." The demand for pilotage fees also reached the National Mediation Board on at least one occasion which resulted in an agreement dated September 1, 1958, containing the present language under Rule 6—Rates of Pay.

When Perry Towing Company entered the picture, the pilots previously employed by the Virginian Railway continued to work for Perry under an interim agreement incorporating the Virginian Railway agreement. The pilots requested Perry's permission to charge the ships, which request was refused. With Coal Terminal, the successor to Perry, the pilots demanded a docking fee of $7.50 in addition to the daily *extra* compensation of $8.50. The consummated agreement, while granting certain increased benefits, made no change in the pay for docking and undocking.

After the formal agreement of March 1, 1961, between Perry and the Local, the pilots commenced presenting bills to the masters of various ships (including those owned by Pocahontas Steamship Company and Marine Coal Transport Corporation) for pilotage fees. In many instances the ships' masters signed the slips presented by the pilots.[7] When Perry was advised as to this procedure, the pilots' agent was notified that such a practice was not acceptable. Later it was learned that the practice had not ceased, or had otherwise temporarily stopped and was thereafter renewed, and notices were then posted on the tugs prohibiting the presentation of bills to ships' captains. After a period of time during which the practice stopped, it was again resumed.

Coal Terminal succeeded Perry in February 1964. It had no knowledge as to the pilots' insistence in presenting pilotage slips to the vessel's master until the union withdrew its demand in the course of negotiations and then entered into the collective bargaining agreement of September 22, 1964. The present actions were filed on December 31, 1964, and January 22, 1965. Coal Terminal, after the commencement of the actions, wrote letters and posted notices directing the discontinuance of the practice adopted by the pilots.

■ The pilots urge that, by reason of performing a service to the ship, they are protected by a maritime lien. This, however, is not the issue in this case. Many suppliers, shipyards, etc., are entitled to maritime liens, but when they have received compensation for their supplies or services from one other than the shipowner, they are no longer entitled to assert any lien. By their course of dealings and contractual arrangements with others, they are effectively estopped from asserting such a lien, or have otherwise bargained it away.

■ In the final analysis this is purely and simply a contractual dispute grounded in the field of labor bargaining. The shipowners had no contact with the pilots [8] or with their employers,

---

7. The slips which the pilots caused the masters of the oceangoing vessels to sign were not used by either Virginian Railway, Perry, or Coal Terminal. They were on a printed form bearing the heading "Association of Hampton Roads Docking Pilots," which forms were used for docking and undocking vessels not entering or leaving the coal piers. Slips provided by the tug owners did not contain language indicating the payment of a bill by the shipowner.

8. Other than the fact that the pilots boarded the vessels and, on occasions, presented pilotage slips to the vessels' masters, all alluded to herein.

Perry or Coal Terminal. The Norfolk and Western Railway billed the shipowners for all services. The fact that the shipowners assumed the responsibility for the pilots' actions, save and except willful misconduct or gross negligence, does not create either an employer-employee relationship or an obligation to pay for service performed. There are many instances involving the "loaned servant" doctrine in which, for example, party "A" rents a crane and its operator from party "B" at a specified rate per hour, with the crane operator remaining on the payroll of "B". If an accident occurs with "A" having the ultimate control, "A" is liable and "B" is relieved of liability. Conversely, even though the crane operator performs services for "A", he is not entitled to be paid by "A" when he is receiving payment from "B" for a service rendered in accordance with the understanding of all parties. To carry the pilots' theory to the extreme, longshoremen unquestionably render a service to the ship in loading and unloading cargo; they are entitled to certain maritime benefits and warranties by reason of performing the traditional work of seamen; they frequently receive extra compensation for doing hazardous work aboard ship; if employed directly by the shipowner, they undoubtedly have a maritime lien against the vessel. Nevertheless, no one has yet suggested that longshoremen may collect wages from the shipowner for services performed aboard the vessel. He looks to his stevedore as his employer from whom he draws his wages by reason of his contractual duties.

■ The documentary evidence conclusively establishes that, as far back as 1945, the National Organization, Masters, Mates and Pilots, agreed with the Chesapeake and Ohio Railway Company on a flat monthly rate, in addition to their regular compensation, for masters assigned exclusively to docking and undocking ships at the coal piers, and likewise agreed to a "per ship" charge for the same service at Newport News Shipbuilding and Dry Dock Company. The Chesapeake and Ohio agreement is the forerunner of the present agreement giving rise to this controversy.[9] While this Court does not suggest that the issue now raised is foreign to the bargaining table—where indeed it has been on many occasions—it affords no basis for saying that these pilots have even the semblance of a claim against the shipowners. The exceptive allegations must be sustained.

An appropriate order will be entered upon presentation. Under the assumption that counsel are in accord with the view that this ruling disposes of the merits of the cases, a final decree in the consolidated actions will be entered.

9. It is clear that the pilots are bound by the agreement negotiated by Local No. 9 insofar as claims against their own employer are concerned. J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 338-339, 64 S.Ct. 576, 88 L.Ed. 762 (1944). The conclusion reached in the present case is not grounded upon any theory of third-party beneficiary as, generally speaking, third-party beneficiaries cannot rely upon the contract as a defense. 17 Am.Jur. (2d), Contracts, § 302. The surrounding circumstances at the time the contract was made, including any prior course of dealings between the parties, is proper to consider in determining the intent of the parties. 17 Am.Jur. (2d), Contracts, § 272.