**Emmett MERCEREAU, Plaintiff,**

v.

**M/V WOODBINE, etc., et al., Defendants.**

**Civ. A. No. C80–2162.**

United States District Court, N.D. Ohio, E.D.

Nov. 3, 1982.

William B. Carle, David G. Davies, Ray, Robinson, Hanninen & Carle, Cleveland, Ohio, for plaintiff.

Creighton E. Miller, Miller, Stillman & Bartel, Cleveland, Ohio, for defendants.

## OPINION AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Emmett Mercereau brought this action against defendants M/V Woodbine and the Andy Machinery Company (hereinafter "Andy") in order to recover wages and other expenses allegedly due him for services performed on the Woodbine. Mercereau seeks the enforcement of a maritime lien he placed on the Woodbine. This Court has jurisdiction pursuant to 46 U.S.C. § 971. After trial and presentation of evidence, the Court herewith submits its findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

The M/V Woodbine is a former Coast Guard buoy tender that has been moored at Cleveland, Ohio since it was decommissioned in 1972. It was at one time utilized as a training facility by the Cleveland Public School System, and in 1978 was sold to B & B Wrecking Co. Andy purchased the Woodbine from B & B on March 15, 1980 for $145,000. Because Andy is primarily involved in the business of buying old vessels for resale at a profit, it began advertising the Woodbine for sale almost immediately after purchasing it.

On or about June 2, 1980, Gregory Choo of San Francisco agreed to purchase the Woodbine from Andy for $250,000. He placed $25,000 down as earnest money and agreed to pay the balance within 30 days. Choo was unable to pay the $225,000 within that 30 day period, but Andy consented to keep the agreement open for an additional 30 days after Choo paid the company anoth-

er $10,000. Choo paid an additional $5,000 as well, before he realized that limited funds would prevent him from purchasing the ship.

Choo's original plans were to repair the Woodbine and sail her from Cleveland, up the St. Lawrence Seaway, and down the eastern seaboard to Baltimore.

Emmett Mercereau is a resident of Burlingham, Washington, and has been a merchant seaman for over 40 years. He is also a licensed boatswain. He began his career as a basic seaman performing such jobs as painting, rigging, steering, and other necessary tasks aboard dry cargo ships. He has sailed around the world three times.

Mercereau first met Gregory Choo in the spring of 1980 in Seattle, Washington, when Choo was beginning to assemble a crew for the Woodbine. In June of 1980, Choo called Mercereau and offered him a job on the Woodbine for $40 a day plus $40 a week for food. Because Mercereau had never sailed on the St. Lawrence Seaway and was eager to do so, he accepted the offer.

Choo flew Mercereau from Seattle to Cleveland, and Mercereau first boarded the Woodbine on June 6, 1980. Eugene Harrison, a man hired by Andy to keep watch on the vessel during the evening hours, had been on board several months when Mercereau arrived, but Harrison's only actual time on board was the four evenings a week that he slept on the boat. The balance of his time was occupied with other jobs, unrelated to the Woodbine.

Choo arrived on board with Mercereau, and spent about a month on the vessel. He sent an engineer and an electrician from Baltimore to Cleveland to check out the electrical system and get the diesel engines in working order.

Mercereau aided these men in their work by helping them make repairs, and he continued to perform a variety of jobs after they left. Mercereau spent almost 24 hours a day on board the Woodbine. He started the engines every day and jacked them a quarter turn in order to equalize the effect of the heat lamps which he had shining on them. He transferred fuel from a tank at the port side of the boat to another tank at the starboard side in order to equalize the vessel's weight. He retied the lines that were holding the Woodbine to the dock and placed tires between the concrete wall of the dock and the boat to prevent the side of the boat from being damaged. He also cleaned the lines, sorted various parts and pieces, caulked around leaky hatches, plumbings, and pipe fittings, and removed large amounts of garbage that had accumulated on the Woodbine over a period of years. Mercereau kept a careful log of everything he did aboard the Woodbine, which was, in short, everything in his power to clean her, repair her, and get her ready to sail.

The Woodbine is moored in close proximity to the Cleveland Stadium, so, on occasion, trespassers were a problem. Mercereau twice had to call the police for assistance.

By late summer of 1980, the Woodbine was in improved shape, and there was no reason to believe, that with some more work, it could not make the trip up the St. Lawrence. By this time, however, Andy realized that Choo was encountering financial problems in his attempt to purchase the vessel, so the company began running advertisements in marine publications in the hope of soliciting another buyer. Eugene Harrison was still sleeping on board four nights a week, and Coast Guard engineers were brought in to check over the engines.

There was no credible evidence that Andy was considering selling the Woodbine for scrap. It is doubtful that Andy would have paid as much as $145,000 for a ship which it did not believe could sail, in addition to the fact that the company hired a man to stay on board evenings and was obviously concerned about the operation of the engines. Additionally, the publications in which Andy was advertising the Woodbine were subscribed to by readers who operated marine vessels, not scrap dealers. The evidence is clear that the Woodbine was still a viable sailing vessel, and that Andy realized that.

Mercereau had very little contact with Andy or Choo during his time spent on the Woodbine. He was requested by Andy to measure the chain pipe for an anchor windlass, which he did, and he actually installed a new windlass. During the fall, when the weather began to get cold, Andy sent Mercereau $500 to buy warmers for the vessel and a used television set for himself. Andy was thus well aware of Mercereau's presence on the Woodbine, and even after Choo began encountering financial problems, Andy not only acquiesced in Mercereau's presence on the vessel, but affirmatively utilized his services. The only contact Mercereau had with Choo was when Choo sent him $200 in November of 1980. This money was to buy food and was the only salary Mercereau received during the entire time he was on the Woodbine.

Andy apparently did become concerned about being held liable for Mercereau's wages, and in September of 1980, the company asked Mercereau to sign a form absolving Andy and the Woodbine from any liability for those wages. Mercereau refused to sign this form, and when Andy finally realized that Choo could not purchase the Woodbine, Mercereau was asked to leave the vessel. Mercereau again refused, and in November of 1980 he took steps to enforce a lien on the Woodbine to recover his wages. It was not until January 29, 1981 that Mercereau actually left the Woodbine, to return home to Seattle via bus. Shortly after Mercereau left Cleveland Andy hired Meryl Christman to stay on board the vessel. When Harrison left not long after that, Andy hired Joseph Nestor to replace him. Andy obviously needed two men on board the Woodbine. The Woodbine was recently sold by Andy to F.T.C. Fish Company for $240,000. F.T.C. intends to use the vessel for fishing off the west coast of the United States.

Emmett Mercereau has received no wages for his work on the Woodbine, outside of the $200 that he received from Choo in November of 1980. He spent almost eight months on the vessel, from early June 1980 until late January 1981. He performed a variety of duties while on board, and although he did help keep trespassers off the vessel, his job entailed far more than that. Clearly, Mercereau's job was to be that of seaman, to help ready the vessel for her voyage, as well as to work on her during that voyage. He played a significant role in utilizing his knowledge as a seaman to do all he could to prepare the Woodbine for a trip up the St. Lawrence Seaway and down the Atlantic coast and is now asking this Court to enforce the lien he placed on the Woodbine in order to recover money due him for the work performed in playing that role.

### Conclusions of Law

#### I

■ This Court concludes that Emmett Mercereau is a "person" within the meaning of 46 U.S.C. § 971. That statute provides:

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a lien on the vessel, which may be enforced by a suit in rem, and it shall not be necessary to allege that credit was given to the vessel.

Andy argues that Emmett Mercereau is not a seaman, but a watchman, and the only duties he performed while on the Woodbine were those of a watchman.

■ "... the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Emmett Mercereau's background and experience undoubtedly qualify him as a legitimate seaman, but such a title is irrelevant to the determination of the issue at hand. The statute in question only states that any "person" who furnishes repairs, necessaries, etc., to a vessel can place a lien on that vessel. There is no requirement that such person be a seaman. It thus makes no difference whether the person attempting to enforce a lien on a vessel is or is not a

seaman. The crucial initial question is what type of tasks did that person undertake while working on the vessel.

The variety and number of jobs that Emmett Mercereau performed on the Woodbine, such as repairing the engines, transferring fuel from one tank to the other, tying and clearing the lines, and caulking around leaky hatches, qualified him as far more than a mere watchman. His concern with preventing trespassers from boarding the Woodbine, while not unimportant, constituted a minor role in the broad range of his duties.

In the case of *In Re Queen Ltd.,* 361 F.Supp. 1009 (E.D.Pa.1973), the court enforced a lien placed by persons who cleaned and scrubbed decks, corridors, and rails on the Queen Elizabeth. The lien was placed to recover wages. The court, reiterating a test laid down in *The Penn,* 273 F. 990 (3rd Cir.1921), stated that, "The test of what is necessary [to a vessel] is what is reasonably needed in the ship's business."

This Court harbors no doubts that the range of duties performed by Emmett Mercereau were, at the bare minimum, reasonably needed in the business of preparing the Woodbine to sail. Clearly, those duties were well within the scope of 46 U.S.C. § 971.

## II

Nor can this Court conclude that the Woodbine is a "dead ship", upon which a lien cannot be placed. In *In Re Queen, Ltd., supra,* the Queen Elizabeth was afloat but waiting to be towed 7,000 feet to a permanent berth, and her propellers were disconnected so she had no power of her own. The ship would never sail again, but the court did not consider her "dead", and it enforced the lien placed upon her.

"Once a vessel has been completed and launched, its status as a vessel continues even though a good part of the vessel is destroyed." *Advance Welding Co., Inc. v. M/V Corra D, et al.,* 299 F.Supp. 736 (E.D. La.1969). In that case, the Corra D sustained such severe damage in a fire that the insurance underwriter declared her a total loss and paid her owner $50,000. A new owner purchased the vessel for $450 and had her towed to a shipyard where some repairs were made. The court, in enforcing a lien placed on the Corra D by the repairmen to recover their wages, stated that the fact that she was capable of being towed meant that she was not dead and remained a vessel.

A court has enforced a lien placed on a houseboat with no power of its own that always had to be towed, "as would the most lowly of dumb barges." *Miami River Boat Yard, Inc. v. 60' Houseboat, Serial No. SC–40–2860–3–62,* 390 F.2d 596 (5th Cir.1968). The court in that case, adopting the definition of "vessel" used in 1 U.S.C. § 3, stated that:

A "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

See also *M/V Marifax v. McCrory,* 391 F.2d 909 (5th Cir.1968).

The M/V Woodbine is not a dead ship, and a valid lien placed upon her is enforceable. This Court heard no credible evidence that Andy ever considered selling the vessel for scrap. The company paid $145,000 for the vessel, hired men to stay on board to perform various jobs, requested the Coast Guard to check her engines, and advertised her for sale in publications subscribed to by operators of marine vessels. Gregory Choo obviously did not consider the Woodbine to be dead, nor did F.T.C. Fish Company, the vessel's recent purchaser who intends to sail her off the west coast of the United States. The great weight of the evidence shows the Woodbine to be a viable and navigable sailing ship.

## III

Nor is there merit in Andy's contention that since Mercereau's wage and subsistence agreement was with Gregory Choo, Andy cannot be held liable for money due Mercereau under that agreement.

The vessel is considered a distinct entity responsible for its own debts. The lien

is a proprietary right in the vessel itself as distinct from any personal liability. *Riffe Petroleum Co. v. Cibro Sales Corp.,* 601 F.2d 1385 (10th Cir.1979).

Andy's reliance on *W.A. Marshall & Co. v. The President Arthur,* 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846 (1929) for the proposition that Mercereau waived any right he had to a lien when he reached his financial agreement with Choo is misplaced. The *President Arthur* does not stand for such a proposition. In that case, the petitioner made a specific, separate agreement for security with the respondent that was in addition to the main contract made for the sale of coal. The additional security agreement stated explicitly that it was to be the only security agreement between petitioner and respondent. The Supreme Court held that in making such an agreement, the petitioner waived any right he had to seek security by placing a lien on the President Arthur. In the instant case, Mercereau made no such security agreement with Choo. Thus, at no time did he relinquish any right he had to place a lien on the Woodbine.

Andy additionally contends that the case of *Treakle v. Pocahontas Steamship Co.,* 273 F.Supp. 608 (E.D.Va.1967) supports the argument that one who receives compensation for supplies or services rendered to a ship from one other than the shipowner is no longer able to place a lien on the ship. The facts in *Treakle,* however, are vastly different from those in the case at hand. In that case, tug boat pilots were not only paid in full under a contract they had with their employer, but they received additional compensatory pay as well to "cover the service of docking and undocking ships". The pilots sought even further additional pay for the small amount of time they spent on the large ships that they guided into port. The court would not enforce liens placed on those ships because the pilots had already been more than paid in full for their services.

The only compensation that Emmett Mercereau has received is the $200 that Choo sent him in November of 1980. Mercereau is not seeking additional compensation outside of his original agreement with Choo; he seeks only to recover that money which Choo agreed to pay him for his work on the Woodbine. The holding in *Treakle* is inapplicable to the facts in the instant case.

Andy was owner of the Woodbine during the time Mercereau was living and working on board as well as when this action was filed. The company requested Mercereau to do certain jobs on the vessel and reaped the benefits of the work he performed. There can be no doubt that Andy expressly ratified Mercereau's presence on the Woodbine, enjoyed the benefits of his labor, and played a role in directing his activity.

Choo himself was never denied authority to bind the Woodbine in his agreement with Mercereau. He was in the process of purchasing the vessel, and there was no evidence presented that Andy denied Choo the authority to hire a crew for the Woodbine.

The rule, therefore, appears to be that, while the repairman is charged with notice of all that reasonable diligence would have disclosed, he is not defeated unless the orderer is explicitly denied authority to bind the vessel.

*Hercules Co. v. The Brigadier General Absolom Baird,* 214 F.2d 66 (3rd Cir.1954).

When supplies are furnished for a ship to one lawfully having management of the ship, the presumption is that the ship is liable for them. If the materialman knows nothing about the authority of the person in possession of the ship, except that he visibly has the management of it, he may furnish the supplies, and the ship will be bound for them.

*The City of Milford,* 199 F. 956 (D.Md.1912). See also *The Everosa,* 93 F.2d 732 (1st Cir. 1937).

This Court therefore holds that Gregory Choo had the authority to bind the Woodbine, and that Andy, by never expressly denying Choo that authority, and by reaping the benefits of Mercereau's work on the vessel, is liable for any money due Mercereau under his financial agreement with Choo.

*Damages*

Emmett Mercereau has presented unrebutted evidence that Gregory Choo agreed to pay him $40 a day for working on the Woodbine, plus $40 a week for food and travel expenses to and from Cleveland, Ohio. Mercereau was on board the Woodbine for 240 days; his total salary for that time is thus $9,600. The amount of money he should have received for food is $1,371.43. Evidence was presented that Mercereau's plane fare from Seattle to Cleveland was paid for by Choo. The return economy class fare, which was not paid for, was $320. These three figures total $11,291.43. Subtracting the $200 that Choo sent Mercereau in November of 1980 leaves a figure of $11,091.43.

"The general rule in admiralty law is that prejudgment interest should be awarded absent peculiar circumstances." *International Paint Co., Inc. v. M/V Mission Viking,* 637 F.2d 382 (5th Cir.1981). Additionally, district courts have been urged to allow the interest rate prevailing commercially at the time of judgment. *Ameejee Valeejee and Sons v. M/V Victoria U.,* 661 F.2d 310 (4th Cir.1981). The prevailing interest rate today, which can be earned relatively safely in several forms of investment, is approximately 11.5%. This Court will therefore award simple interest of 11.5% on the figure of $11,091.43 from the date of January 29, 1981, Mercereau's last day on the Woodbine, until September 24, 1982. This interest figure amounts to $2,107.22. This Court therefore holds that Andy Machinery Co. is liable to Emmett Mercereau in the sum of $13,198.65.

IT IS SO ORDERED.