Jesse NOEL, Libellant,

v.

ISBRANDTSEN COMPANY, Incorporated, a corporation, and United States of America, Respondents.

No. 474.

United States District Court
E. D. Virginia,
Newport News Division.

Dec. 28, 1959.

Henry E. Howell, Jr., Norfolk, Va., for libellant.

John W. Winston, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for Isbrandtsen Co., Inc.

John M. Hollis, U. S. Atty., and W. Farley Powers, Jr., Asst. U. S. Atty., Norfolk, Va., for the United States.

WALTER E. HOFFMAN, District Judge.

In an *in personam* action libellant, Noel, a competent marine surveyor, seeks damages at the hands of respondents for serious and permanent injuries sustained on September 5, 1957, on board the S. S. William Bevan, a vessel owned by the United States and chartered to Isbrandtsen Company, Incorporated.

The original bareboat charter to Isbrandtsen was effective in September, 1956, at which time the vessel was removed from the "moth ball fleet", taken to a Brooklyn Shipyard, and placed in condition for use by the charterer, Isbrandtsen, in the coal trade. At that time the owner and charterer conducted an on-hire survey and a report was made as to the condition of the vessel.

Following eight round trip voyages between the United States and Europe, the charterer elected not to renew the charter party agreement and gave notice of termination to the owner. On August 26, 1957, the William Bevan was placed alongside a pier at the Newport News Shipbuilding and Drydock Company and the crew signed off, with the exception of the captain, chief engineer, chief mate, first assistant mate, steward, and one or two other personnel. Pursuant to a contract between Isbrandtsen and the Shipyard, work was immediately commenced to deactivate the vessel for the purpose of its return to the "moth ball fleet" in the James River, a few miles north of the Shipyard. Under the contract the vessel was to be stripped for layup. Without enumerating the many items of work to be performed, it is sufficient to state that it became a "dead" vessel with the rudder and main engine shaft secured, tanks drained, equipment removed, etc. The total contract price was in excess of $33,000. Practically all of this work had been completed as of the date of libellant's accident and, while the vessel was not actually delivered to the United States until September 7, 1957, a period of two days after the accident, it is clear that the William Bevan was a "dead" ship removed from navigation as of the date of the injury. It was subsequently towed to the "moth ball fleet".

■ It became necessary for the owner and charterer to employ the services of marine surveyors to conduct an off-hire condition survey preparatory to a final termination of the charter. In other words, it was the duty of the charterer to again place the William Bevan in a "dead" ship status. For this purpose, Isbrandtsen employed the services of libellant, an independent marine surveyor, to do this work in conjunction with the owner's surveyor. In essence, libellant's duties were to see that the owner's demands were proper, and the

duty of the surveyor employed by the owner was to ascertain what was required to return the ship to its former status as it existed as of the date of the on-hire condition survey conducted approximately one year prior thereto. While Isbrandtsen contends that libellant was its employee at the time of the accident and, therefore, is limited to compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., or the Virginia Workmen's Compensation Act, Code 1950, § 65–1 et seq., there is no merit to this argument as libellant was clearly an independent contractor.

While attempting to climb up the batten boards on the port side of the No. 2 'tween deck in order to place himself in a position to inspect the overhead beams for the purpose of ascertaining whether the coal had been cleaned from these beams, libellant placed his hand upon a batten clip used to hold the batten board in place, and endeavored to pull himself up. The clip gave way and libellant fell to the deck, permanently injuring his right foot. The batten boards and clips are placed against the skin of the ship to protect same from general cargo in the hold, but the boards and clips serve no purpose when the vessel is used in the coal trade which, as noted, was the use for which it was devoted by Isbrandtsen.

■ It is abundantly clear from the evidence that there is no showing of negligence as to either respondent. The nature of the fracture in the batten clip was not such that it could have been determined without a minute inspection. In fact, it is probable that even the closest inspection would not have disclosed the defect. Peter Paul, Inc. v. Rederi A/B Pulp, 2 Cir., 258 F.2d 901; Dillingham v. Smith-Douglass Co., Inc., 4 Cir., 261 F.2d 267. There are literally thousands of batten clips used for the purpose of holding batten boards in place and it is not unusual, as in this case, to find many of these clips broken or missing. As to the possible negligence of the charterer,

there is no evidence as to how or when the clip was initially fractured, and the charterer's knowledge of the imperfection is completely lacking. Indeed, it may be reasonably inferred from the lack of paint on the clip that the condition existed prior to the commencement of the charter. To impose a duty, under such circumstances, upon the charterer would be tantamount to requiring a metallurgical test to be applied to each clip. With respect to the owner, a minute inspection of batten clips was not required at the time of the charter, more especially when we consider that the batten boards served no purpose in the contemplated use of the vessel. Additionally, the owner owed no duty of due care to anyone on board the vessel for the benefit of the charterer. In the absence of a duty owed, there can be no negligence under ordinary circumstances.

■ Equally without merit is the contention that the use of a ⅜″ cylindrical batten clip constitutes negligence, and that a bareboat charterer is guilty of negligence in commencing a voyage with batten clips of this type. While it is undoubtedly true that crew members customarily climb upon batten boards for various purposes, all of which is within the knowledge of the officers, owners, and charterers, the evidence does not suggest that batten clips must be of such a type as never to break, particularly where the clip is subjected to the pressure of force by one using same to assist in climbing the boards. There is no testimony that this type of batten clip, if sound, could not withstand the weight of libellant. No representation was made to libellant by either respondent that any part of the vessel was safe. By reason of the conclusions herein reached, it is unnecessary to consider whether libellant was guilty of any contributory negligence. Nor need we discuss the familiar rule that the duty to provide a safe place to work does not apply where the prosecution of the work itself makes the place unsafe and creates the danger. Filipek v. Moore-McCormack Lines, 2

Cir., 258 F.2d 734, 735, cited with approval in West v. United States, infra.

We turn to the question of unseaworthiness and the status of the William Bevan. The most recent pronouncement in a case involving a "dead" ship is West v. United States, 80 S.Ct. 189, 192, affirming the Court of Appeals for the Third Circuit, 246 F.2d 443. While West presents a factual situation of an accident at a time when the vessel was at a repair dock for the purpose of making her seaworthy—and the present controversy reverses that picture—no significance is attached to the fact that in one case the vessel was "dead" and about to be brought to life, whereas in the other the vessel had been alive and was in a dying condition. As was said in West:

> "This undertaking was not 'ship's work' but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case. It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen are doing on shipboard at the moment of injury."

The question of unseaworthiness as applied to a "dead" ship has been previously discussed by this Court in Roper v. United States, D.C., 170 F. Supp. 763, wherein the authorities are considered at length. While Roper is now on appeal and presents the novel problem of the status of a "dead" ship when in use for commercial purposes, a contrary ruling by an appellate court in Roper would not alter the conclusion herein reached that the warranty of seaworthiness would not be applicable to. the present libellant. The William Bevan was a vessel "out of navigation" at the time and place of the accident. Libellant cannot support his claim under the doctrine of unseaworthiness, and this is true even though we assume that libellant was, at least in part, doing work traditionally done by seamen.

Proctors for respondents will prepare an appropriate decree in accordance with this opinion, which is adopted by the Court as its findings of fact and conclusions of law pursuant to General Admiralty Rule 46½, 28 U.S.C.A., and, after presentation to opposing proctors for inspection and endorsement, present the same for entry.