**AMOCO OIL, Plaintiff-Appellee,**

v.

**M/V MONTCLAIR, etc., et al., Defendants,**

**BARGE OCEAN STATES, Her Engines, Tackle, Apparel, etc., In Rem, Defendant-Appellant.**

**BAYCON INDUSTRIES, INC., etc., Plaintiff-Appellee,**

v.

**M/V MONTCLAIR, etc., et al., Defendants,**

**BARGE OCEAN STATES, Her Engines, Tackle, Apparel, etc., In Rem, Defendant-Appellant.**

No. 84–3610.

United States Court of Appeals, Eleventh Circuit.

July 23, 1985.

David F. Pope, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiffs-appellees.

Steven L. Brannock, Holland & Knight, David W. McCreadoe, Tampa, Fla., for defendant-appellant.

Before KRAVITCH and HATCHETT, Circuit Judges, and THOMAS *, District Judge.

DANIEL HOLCOMBE THOMAS, District Judge:

This is an appeal from the United States District Court for the Middle District of Florida. We affirm.

The undisputed facts in this case are as follows: On July 10, 1981, an agent of the Barge OCEAN STATES contacted a towing corporation and the Tampa Bay Pilots Association to arrange for the towing of the OCEAN STATES from the Fina Terminal to Tampa Barge Services in Tampa Bay. Pilot B.F. Wiltshire, a self-employed Bar Pilot, was contacted by the Pilot's Association to take charge of the tow. At the time of the tow, the Barge OCEAN STATES had no propulsion and was manned by a "riding crew" who were not involved in the navigation of the barge. Pilot Wiltshire was a compulsory pilot, neither selected nor supervised by OCEAN STATES. He was in charge of all aspects of the towing operation including the positioning of the tugs and the direction of the riding crew aboard the OCEAN STATES during the tow. Pilot Wiltshire underestimated the power necessary to control the barge in light of the wind conditions prevailing when the flotilla (consisting of the Barge OCEAN STATES and two tugs) left the Fina Docks. As a result of his failure to properly evaluate the wind and tide conditions, the Barge OCEAN STATES collided with and damaged Baycon Barge # 214 and the Amoco dock facility. Pilot Wiltshire's negligence was the sole cause of the collision. The tugs maneuvering the barge and the riding crew under Pilot Wiltshire's

---

* Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation.

control performed in all respects in accordance with his orders. There was no contention that the barge OCEAN STATES was unseaworthy or that its riding crew caused or contributed in any way to the collision.

Baycon and Amoco sued the owners of the Barge OCEAN STATES *in personam* and the barge itself, *in rem*, for the damages that were sustained as a result of the collision.[1] The Barge OCEAN STATES moved for a summary judgment. The district court denied summary judgment holding that the OCEAN STATES was liable *in rem*.

Reaffirming its summary judgment order, the district court entered final judgment against the Barge OCEAN STATES on the issue of its liability *in rem*. The issue of damages was severed and has not been tried pending review by this court.

The sole issue in this case, which is uncontroverted by either party, is whether a barge without motor power that is being towed by two tug boats, and the flotilla is under the complete control of a compulsory pilot, is liable *in rem* for damages caused when that barge, through no fault of its own, but solely that of the compulsory pilot, is towed into a vessel or dock owned by a third-party.

■■■ The resolution of this issue depends upon whether or not the barge at the time in question was a "vessel" or a "dead ship". If she was a vessel, she is liable *in rem*. If she was a dead ship, she is not liable *in rem*. We hold that the Barge OCEAN STATES was a vessel and is thus liable *in rem*.

It is stated in *Admiralty Law of the Supreme Court* § 13–1 (3rd Ed.1979): "Local state laws may require that vessels operating in state waters be put in charge of pilots licensed by the state. When a vessel is being operated by such a compulsory pilot and it causes damage due to the pilot's negligence, the vessel is liable in an action *in rem* but there is no personal

liability on the owner." *See The China*, 74 U.S. (7 Wall) 53, 19 L.Ed. 67 (1868).

The same issue is discussed in *Benedict on Admiralty*. There it is stated: "[t]he shipowner is not personally liable for injuries inflicted exclusively by the negligence of a pilot compulsorily accepted by the vessel but the vessel is liable *in rem* upon a distinct principle of the maritime law, namely, that the vessel in whosesoever hands she lawfully is, is herself considered the wrongdoer liable for the tort and subject to a maritime lien for the damage." 1 E. Benedict, *The Law of American Admiralty* 362 (6th Ed.1940).

The author further states that "... [o]ne who ..., through the instrumentality of the ship, has suffered a wrong that is within the maritime jurisdiction, shall have by way of security or redress, an enforceable interest in the ship." *Id.* at 17.

"Whenever a debt of maritime nature is by law, ... or by contract, a lien upon a vessel, the vessel may be proceeded against *in rem*." *Id.* at 22.

In the instant case, Pilot Wiltshire was employed as a pilot to see that the OCEAN STATES, and in fact the entire flotilla, was safely maneuvered from Fina Terminal to Tampa Barge Services. He was in full command of the entire maneuver. He could have ordered more tugs or released some. His job was to see that the OCEAN STATES was transited without damage to herself nor anyone else. It was stipulated that neither tug was at fault. *The China* is the complete answer in this case. *The China* poses this question on page 61 of 74 U.S.: "Does the fact that the law compelled the Master to take the pilot, exonerate the vessel from liability?" *The China* very definitely holds that under American law it does not exonerate the vessel from liability.

*The China* is still the law. *The China* was discussed at length by the Ninth Cir-

---

1. Baycon and Amoco also sued the owners of the tugs assisting in the tow and Pilot Wiltshire. The court's order exonerated the tugs from liability and by joint stipulation Amoco and Bay-con's complaint and OCEAN STATES' third-party complaint against Pilot Wiltshire were dismissed with prejudice.

cuit in the case of *State of California v. The Italian Motorship Ilice*, 534 F.2d 836 (9th Cir.1976). It summarizes this discussion by saying, "[w]e conclude that there is no basis on this record for holding that the Supreme Court's rule in *The China* has been weakened or destroyed. Even if the wisdom of that rule is subject to discussion, if *The China* is to be overruled for that reason, it should be done by the Supreme Court itself." 534 F.2d at 843.

In the case of *Gulf Towing Co., Inc. v. The Steam Tanker Amoco New York*, 648 F.2d 242 (5th Cir.1981), The Harbor Tug TAMPA sank while assisting the Amoco New York, which was piloted by a compulsory pilot. The District Court found that "no fault or negligence of the TAMPA proximately caused or contributed to its sinking and that Amoco Shipping and the crew of the Amoco New York were not negligent and did not cause or contribute to the sinking of the TAMPA." The District Court entered judgment against both the pilot and the Amoco New York, *in rem*, after concluding that "the damage to the TAMPA was caused by [the pilot's] negligence which in turn was imputed to the Amoco New York *in rem*." Although the above noted case was primarily concerned with an exculpatory provision contained in the pilotage agreement, the entire judgment of the district court was affirmed by the Fifth Circuit in a per curiam opinion before Judges Roney, Johnson and Henderson.

The appellant in this case insists that the case must be reversed on the authority of *Tampa Ship Repair & Dry Dock Co. v. A.P. St. Phillip, Inc.* (The Penn Vanguard), 1971 A.M.C. 1549 (M.D.Fla.1971), *aff'd*, 440 F.2d 1193 (5th Cir.1971). In the district court's opinion in the *Penn Vanguard*, Judge Lieb in his Finding of Fact No. 2, stated that at the time in question, "[the Penn Vanguard] had been discharged, her machinery was not operating. She was a 'dead' ship." 1971 A.M.C. at 1550. Judge Lieb in his Conclusions of Law No. 3, on page 1553 again stated, "The Penn Vanguard was a dead ship, under tow, and a mere passive instrument by which the dam-

age to the dry dock was occasioned. The Penn Vanguard is not liable, *in rem*, for damages to the dry dock wall." In affirming Judge Lieb, the Fifth Circuit at 440, F.2d 1193, held that Judge Lieb's Findings were not clearly erroneous.

The *Penn Vanguard* is distinguishable from the present case in that Judge Lieb held that the Penn Vanguard was a "dead ship". On rehearing, the Fifth Circuit, Judge Tuttle writing for a panel consisting of himself, Judge Ainsworth and Judge Simpson, stated that "this appeal and cross-appeal raises only fact issues." He further stated, "The Vanguard was a 'dead ship', and the motor power was supplied by three tug boats, the Mary, the Edward and the Tony." 440 F.2d at 1193. The opinion of the Fifth Circuit does not further discuss the "dead ship" issue, but spends most of the time discussing the quantum of the damage. The opinion states, "Appellees simply argue the trial court's findings were not clearly erroneous." *Id.* at 1194. The opinion ends with the statement, "The judgment is in all respects affirmed." *Id.* at 1195. Judge Tuttle in his opinion denying petition for rehearing discussed only the question of admissibility of evidence concerning repairs. The "dead ship" issue apparently was not raised on appeal.

■ In this opinion, we simply hold that the *Penn Vanguard* opinion is not controlling because the Barge OCEAN STATES was not a dead ship but a vessel and the law simply stated is, a vessel being operated by a compulsory pilot which causes damage due to the pilot's negligence is liable in an action *in rem*.

The Barge OCEAN STATES at the time in question was certainly a vessel as opposed to being a dead ship. The tugs were guilty of no negligence. The injury was caused solely by the pilot's negligence. The pilot's duty was to see that the entire flotilla was maneuvered safely so as not to cause damage to itself or anyone else. The barge, as a part of the flotilla, was certainly being operated by the compulsory pilot.

We base our holding that the OCEAN STATES was not a "dead ship" in view of the following authorities. First, the Third Circuit drew a distinction between a "dead ship" and a "vessel" stating that where a ship was not properly documented and was not able to sail, but efforts of everyone concerned were bent on readying her for a sealing voyage, the ship was not a "dead ship," that is, a ship withdrawn from navigation and marine commerce, but was a "vessel" subject to admiralty jurisdiction in libel *in rem* to assert a maritime lien for repairs. *Hercules Co. Inc. v. The Brigadier General Absolom Baird,* 214 F.2d 66, 69 (3rd Cir.1954). In addition, the Eastern District of Virginia has held that where practically all of the work in deactivating a vessel for the purpose of its return to a moth ball fleet had been completed at the time of an injury on the vessel to a marine surveyor hired to conduct an off-hire condition survey preparatory to final termination of the charter, the vessel was a "dead ship" and was "out of navigation" at the time and place of the accident and the surveyor was not entitled to recover under the doctrine of unseaworthiness. *Noel v. Isbrandtsen Co.,* 179 F.Supp. 325, 328 (E.D.Va.1959). Finally, the Eastern District of New York has defined a "dead ship" saying that a vessel which had been completely withdrawn from commerce and navigation and was in such condition that extensive repairs and proper documentation would have been required to return it to navigation and commerce was a "dead ship" not subject to a maritime lien. *Hanna v. The Meteor,* 92 F.Supp. 530, 531 (E.D.N.Y.1950).

Title One of the United States Code at Section 3 defines a vessel as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." The Ship Mortgage Act of 1920, 46 U.S.C. § 971, provides in part that any vessel shall be subject to a maritime lien enforced by a suit *in rem.*[2]

Judge Brown writing for the Fifth Circuit in the case of *Miami River Boat Yard, Inc. v. 60 Foot Houseboat,* 390 F.2d 596, 597 (5th Cir.1968) states, "a houseboat is nonetheless a boat because, as its name implies, it affords a water-born place to live with the added advantage of at least some maritime mobility. That she has no motive power and must, as would the most lowly of dumb barges, be towed does not deprive her of the status of a vessel." He states further, "The Houseboat was a vessel capable of being subjected to a maritime lien and the District Court was in error in holding that it lacked subject-matter jurisdiction of the vessel *in rem.*"[3] This is followed by several citations, primarily from the Fifth Circuit.

A reading of the cases distinguishes a dead ship from a vessel by determining whether or not the object in question had or had not been withdrawn from navigation and maritime commerce. The Barge OCEAN STATES was certainly a vessel and not a dead ship.

In reaching a decision in the present case, we do not second guess Judge Lieb as to whether or not the Penn Vanguard was or was not a dead ship. He determined it was and the Fifth Circuit held that his Findings of Fact were not clearly erroneous. The Barge OCEAN STATES had not been withdrawn from navigation, and was certainly used in commerce and was certainly not out of navigation; she was a vessel subject to a maritime lien *in rem.*

A "vessel" is subject to a maritime lien. A "dead ship" is not. There is no statutory definition of a dead ship. We are not attempting to set out a definition of a dead ship which would fit every occasion. We simply hold that the Barge OCEAN

---

2. For citations defining vessels subject to such liens, see note 58 under § 971. For citations defining a dead ship not subject to such liens see note 59.

3. It is important to note that if a vessel is truly a "dead ship" no maritime lien will attach since there would be no admiralty jurisdiction. *See Hercules Co., Inc. v. Brigadier General Absolom Baird, supra.*

STATES was a vessel and subject to a maritime lien under the facts in this case.

WE AFFIRM.