**In the Matter of THE COMPLAINT OF WEPFER MARINE, INC. FOR EXONERATION FROM OR LIMITATION OF LIABILITY**

No. 03–2202 B.

United States District Court,
W.D. Tennessee,
Western Division.

Nov. 9, 2004.

Derrick S. Kirby, Gary T. Sacks, Goldstein & Price, St. Louis, MO, Louis J. Miller, Apperson Crump & Maxwell, PLC, Memphis, TN, for Petitioner.

Matthew H. Ammerman, Thomas C. Fitzhugh III, Fitzhugh & Elliott PC, Houston, TX, for Claimant Liberty Mutual Insurance Company.

John R. Smith, Brown Brasher & Smith, Memphis, TN, for Claimants Jose and Kimberlee Gonzalez.

## ORDER GRANTING IN PART AND DENYING IN PART CLAIMANTS' MOTION TO DISMISS FOR LACK OF ADMIRALTY JURISDICTION

BREEN, District Judge.

In its petition filed April 3, 2003, Wepfer Marine, Inc. ("Wepfer") averred that it was the owner of barge ET–715, a steel-hulled river barge in the process of being broken up by Robinson Maintenance, Inc. ("Robinson") for scrap. Wepfer also owned a deck barge known as the No. 1 crane barge, which was used to accommodate a crawler crane in connection with longshoring work performed by Robinson on the Mississippi River. On March 13, 2002, the crane barge was positioned at or near mile 725 of the lower Mississippi River alongside a floating dry dock upon which the barge breaking was being conducted by, among others, the Claimant Jose Ramon Gonzalez. On that date, Gonzalez, allegedly employed by Robinson as a welder, barge breaker and barge repairman, was seriously injured while in the process of breaking barge ET–715. Gonzalez and his wife, Kimberlee Gonzalez, sued Wepfer in the Circuit Court of Shelby County, Tennessee for alleged injuries and other damages arising from the incident. Wepfer has brought this action claiming the benefit of the Limitation of Liability Act, codified at 46 U.S.C. §§ 181–95 (the "Limitation Act" or the "Act") as to both the river barge and the crane barge. The Gonzalezes and Robinson's insurer, Liberty Mutual Insurance Company, which paid compensation and medical expenses to Gonzalez under Robinson's Longshore and Harbor Workers' Compensation Act policy, have filed claims in this action against Wepfer.

The Act permits the owner of a vessel to "limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446, 121 S.Ct. 993, 1000, 148 L.Ed.2d 931 (2001). Originally enacted in 1851, the statute "was passed to encourage ship building and to induce capitalists to invest money in this branch of industry." *In re Muer*, 146 F.3d 410, 414 (6th Cir.1998) (citing *Norwich & N.Y. Transp. Co. v.*

*Wright,* 80 U.S. (13 Wall.) 104, 121, 20 L.Ed. 585 (1871)), *cert. denied sub nom. Estate of Muer v. Karbel,* 525 U.S. 1103, 119 S.Ct. 867, 142 L.Ed.2d 769 (1999) (internal quotation marks omitted). This purpose is achieved "by exempting innocent shipowners from liability, beyond the amount of their interest." *Id.* (citing *Norwich* ) (internal quotation marks omitted). "When faced with liability for a maritime accident, a vessel owner may file a petition in federal court seeking limitation of liability" under the Limitation Act. *Id.* In seeking such limitation on liability, "a vessel owner also may request exoneration, or freedom from all liability," as the petitioner has in this case. *See Cape Fear. Inc. v. Martin,* 312 F.3d 496, 499 (1st Cir.2002).

▆ In the instant motion, the Claimants, Liberty Mutual Insurance Co. and the Gonzalezes, seek dismissal of this proceeding on two grounds: (1) lack of admiralty jurisdiction based on barge ET–715 vessel status and (2) the untimeliness of Wepfer's petition. Although the Claimants do not identify the procedural rule pursuant to which their motion is brought, the Court assumes, as both arguments are jurisdictional, *see Complaint of Tom–Mac. Inc.,* 76 F.3d 678, 682 (5th Cir.1996); *In re UFO Chuting of Haw., Inc.,* 233 F.Supp.2d 1254, 1256 n. 2 (D.Haw.2001), they intended to invoke Rule 12(b)(1) of the Federal Rules of Civil Procedure, which allows the court to dismiss an action for lack of subject matter jurisdiction. *Anderson v. United States,* 317 F.3d 1235, 1236–37 (11th Cir.2003), *cert. denied,* 540 U.S. 965, 124 S.Ct. 429, 157 L.Ed.2d 309 (2003) (No. 02–1822) (applying Fed.R.Civ.P. 12(b)(1) to a request for dismissal of complaint for lack of admiralty jurisdiction). The court is permitted to weigh the evidence in order to satisfy itself that jurisdiction in fact is present. *See Marina Entm't Complex. Inc. v. Hammond Port Auth.,* 842 F.Supp. 367, 369 (N.D.Ind.1994).

The United States Constitution extends the power of the federal courts "to all Cases of admiralty and maritime jurisdiction." U.S. Const. art. III, § 2, cl. 1. Title 28 U.S.C. § 1333(1) confers on the district court exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." Traditionally, the test for admiralty jurisdiction was whether the injury occurred in navigable waters. *See Masherah v. Dettloff,* 968 F.Supp. 336, 338 (E.D.Mich.1997) (citing *Thomas v. Lane,* 23 F. Cas. 957 (C.C.D.Me.1833)). In 1948, Congress changed the rule by enacting the Extension of Admiralty Jurisdiction Act, which broadened admiralty jurisdiction in the district courts to include all cases of damage or injury "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." *See id.* (citing *Gutierrez v. Waterman S.S. Corp.,* 373 U.S. 206, 209–10, 83 S.Ct. 1185, 1187–88, 10 L.Ed.2d 297 (1963)).

▆ With respect to this case, the federal courts enjoy exclusive admiralty jurisdiction to determine limitation of liability for a vessel owner under the Limitation Act. *In re Muer,* 146 F.3d at 417. The Act does not, however, provide an independent ground for jurisdiction in this Court. *Sea Vessel Inc. v. Reyes,* 23 F.3d 345, 348 n. 6 (11th Cir.1994). When subject matter jurisdiction has been challenged, the party invoking such jurisdiction bears the burden of establishing its existence. *Fernandez v. Haynie,* 120 F.Supp.2d 575, 577 (E.D.Va.2000), *aff'd,* 31 Fed.Appx. 816, 2002 WL 451824 (4th Cir. 2002).

In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), the Supreme Court discussed the long his-

tory of admiralty jurisdiction and refined the parameters thereof, articulating as follows:

> [A] party seeking to invoke federal admiralty jurisdiction ... over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Jerome B. Grubart, Inc.*, 513 U.S. at 534, 115 S.Ct. at 1048 (citing *Sisson v. Ruby*, 497 U.S. 358, 363–65 n. 2, 110 S.Ct. 2892, 2896–97 n. 2, 111 L.Ed.2d 292 (1990)) (internal citations and quotation marks omitted). The location test requires that the injury occur in "navigable waters of the United States" and be caused by a "vessel." *Id.* at 534–35, 115 S.Ct. at 1049. The Court further explained that the first prong of the connection test turns "on a description of the incident at an intermediate level of possible generality." *Id.* at 538, 115 S.Ct. at 1051. As to the second, the court is to "look to whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." That is, the court is to inquire into whether the tortfeasor's activity

> on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand. Navigation of boats in navigable waters clearly falls within the

substantial relationship; storing them at a marina on navigable waters is close enough; whereas in flying an airplane over the water, as in swimming, the relationship is too attenuated.

*Id.* at 539–40, 115 S.Ct. at 1051.

■ It is the assertion of the Claimants that, because barge ET–715 had been removed from navigation and was being cut up for scrap at the time the incident occurred, it was therefore no longer a "vessel" for purposes of admiralty jurisdiction. In its responses to Liberty Mutual's first request for admissions, Wepfer admitted that barge ET–715 was being dismantled for scrap at the time of the accident, that the vessel had been permanently withdrawn from navigation at the time of the injury, that Wepfer had requested Robinson to break the barge for scrap, and that prior to the incident portions of the barge had already been removed for scrap. (Liberty Mut. Ins. Co., Jose Gonzalez, and Kimberlee Gonzalez' Joint Mot. to Dismiss for Lack of Admiralty Juris., Ex. 1, pp. 5–6.) It argues in response to the instant motion, however, that vessels incapable of navigation retain vessel status so long as they previously carried persons or cargo over navigable waters.

"[P]recisely what constitutes a 'vessel,' for purposes of admiralty and maritime jurisdiction, has never been stated by Congress or the courts with comprehensive clarity." *Complaint of Dillahey*, 733 F.Supp. 874, 882 (D.N.J.1990) (quoting 7a J. Moore & A. Pelaez, *Moore's Federal Practice* § 215 (2d ed.1988)). Rather, "each case depends on its particular facts; and structures shade off from what is obviously a vessel to what is obviously not." *Id.* (quoting *Moore's Federal Practice* § 215, *supra*). The term's general definition encompasses "every description of watercraft or other artificial contrivance used, or capable of being used, as a means

of transportation on water." 1 U.S.C. § 3. Similarly, the Limitation Act applies to "all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters," 46 U.S.C. § 188 (utilizing the definition for "vessel" set forth in 1 U.S.C. § 3); *see also Keys Jet Ski, Inc. v. Kays,* 893 F.2d 1225, 1229–30 (11th Cir. 1990) (applying § 3 definition to action under the Limitation Act).

■ Thus, at the outset, the Court must determine whether barge ET–715 was a vessel. The gravamen of the Claimants' argument is that barge ET–715 was a "dead ship," which does not invoke admiralty jurisdiction, as opposed to a "vessel," which of course does. *See Amoco Oil v. M/V Montclair,* 766 F.2d 473, 477 (11th Cir.1985) (a "dead ship," as it is not a "vessel," does not bring into play admiralty jurisdiction), *cert. denied sub nom. Barge Ocean States v. Amoco Oil Co.,* 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 185 (1986). Under the so-called "dead ship doctrine," a craft loses its vessel status when it is so altered that it can no longer serve a navigation function. *See Mullane v. Chambers,* 333 F.3d 322, 328 (1st Cir. 2003); *Goodman v.1973 26 Foot Trojan Vessel,* Ark. Registration No. AR1439SN, 859 F.2d 71, 73 (8th Cir.1988), *reh'g denied* (Nov. 18, 1988); *Statia Terminals N.V. v. Huber, Inc.,* No. Civ. A. 95–1633, 1998 WL 560358, at *37 (E.D.La. Aug. 31, 1998). The *Amoco Oil* court described a "dead ship," which is not defined by statute, as one "withdrawn from navigation." *Amoco Oil,* 766 F.2d at 477. The withdrawal must, however, be permanent rather than temporary. *Mullane,* 333 F.3d at 328. The following cases are illustrative.

In *Hanna v. The Meteor,* 92 F.Supp. 530, 530 (E.D.N.Y.), *aff'd,* 184 F.2d 439 (2d Cir.1950), "the only question presented [was] whether the Meteor was a 'dead ship' at the time of the rendition of services, for upon that determination depends whether the subject-matter jurisdiction of the suit is within the admiralty jurisdiction" of the court. The district court found that the vessel, which had been "completely withdrawn from navigation" and until it was sold for scrap a year later had no crew, operating machinery, heat, light or power, partially disassembled piping and disconnected generators, was a dead ship to which admiralty jurisdiction did not apply. *Hanna,* 92 F.Supp. at 531–32.

The court in *Mammoet Shipping Co. v. Mark Twain,* 610 F.Supp. 863 (S.D.N.Y. 1985) was faced with the question of whether a riverboat renovated for use as a restaurant and showboat and berthed at a pier in Manhattan on the Hudson River was at the time the incident at issue occurred a "vessel" for jurisdictional purposes. In finding it was not, the court drew a distinction between permanent and temporary withdrawal from navigation, articulating that "[a]dmiralty is limited to vessels actively in navigation or only temporarily withdrawn, and where the facts indicate that a vessel has been indefinitely withdrawn from navigation, she is also regarded as withdrawn from admiralty jurisdiction." *Mammoet Shipping Co.,* 610 F.Supp. at 866 (citations and internal quotation marks omitted).

The vessel at issue in *Marina Entertainment Complex. Inc.,* the SS Milwaukee Clipper, was moored in the Hammond Marina in Hammond, Indiana. The Port Authority purchased the ship in 1990 and later that year towed and sank it onto a specially prepared stone bed at the bottom of the marina, where it rested for two years and was used as a venue for social and cultural events. Electrical, natural gas and sewage disposal lines were installed connecting the vessel to shore. *Marina Entertainment Complex. Inc.,* 842 F.Supp. at 369. The court categorized the

Clipper as a "dead ship" as it was no longer a vessel for purposes of admiralty jurisdiction at the time of the incident. According to the evidence presented to the court, the Clipper's utilization for navigation would have required removal of anchor chains and ballast, recertification by the U.S. Coast Guard and the American Bureau of Shipping to operate as a ship, resealing of various cuts in its hull, removal of the utility connections to the shore, rewiring to conform to present Coast Guard and Bureau of Shipping standards and a difficult if not impossible removal from the harbor floor without damage to the dock or breakwall. *Id.* at 370–71. Based on those facts, the court determined that the Clipper had "found its final resting place." *Id.* at 371. *Compare Statia Terminals N.V.*, 1998 WL 560358, at *37 (ship not "dead" for purposes of admiralty jurisdiction that was afloat, operable, intact and viewed as suitable for repair, and where there was no evidence the vessel had been "mothballed") with *Mercereau v. M/V Woodbine*, 551 F.Supp. 811, 815 (N.D.Ohio 1982) (vessel not a "dead ship" where there was no evidence the vessel was to be sold for scrap; company had paid $145,000 for it, hired workers to perform various jobs on board, asked the Coast Guard to check its engines, and advertised it for sale in publications targeting marine vessel operators). In these cases, the courts did not, as the Claimants invite the Court to do here, base their determinations on the vessels' *original* uses.

In this case, it is undisputed that barge ET–715 had been permanently, rather than temporarily, removed from navigation and was being cut up for scrap at the time the injury occurred. There is no evidence to suggest it had a crew or working onboard systems. Nor is there any indication that the parties intended to return the barge to maritime service of any kind, or indeed could have done so. It appears to the Court instead that, like the vessel in *Marina Entertainment Complex, Inc.*, barge ET–715 was destined to sail no more. Thus, the Court finds that it was a "dead ship" and therefore outside the scope of admiralty jurisdiction. Accordingly, the Claimants' motion as to barge ET–715 is granted.

■ The Court's finding does not, however, end the inquiry. As the Court has previously noted, Wepfer has sought in this action limitation of liability as to the crane barge as well as barge ET–715. In their motion to dismiss, the Claimants focus exclusively on barge ET–715, insisting in a footnote that

the Claimants have not asserted a claim against the crane barge, and no allegation has been made that the crane barge caused or contributed to the asserted claims. Rather, it is undisputed that Claimant was working aboard the remains of ET–715, which was perched on a floating drydock. Gonzalez' claims arise from ET–715 and Wepfer's failure to exercise reasonable care in the prevention of falls like that suffered by Mr. Gonzalez.

(Mem. of Facts and Law in Supp. of Liberty Mut. Ins. Co., Jose Gonzalez, and Kimberlee Gonzalez' Joint Mot. to Dismiss for Lack of Admiralty Juris. at 1 n. 1.)

In response, Wepfer suggests that this argument is nothing more than a thinly veiled attempt to defeat jurisdiction in this Court, citing to what it characterizes as contradictory statements made by the Claimant, Mr. Gonzalez, in his pleadings and during discovery. First, in his state court complaint and his claim filed in this Court, Mr. Gonzalez alleged that Wepfer was negligent in, among other things, failing to insure "that pieces of cut scrap iron were secured to prevent Gonzalez from falling." (Wepfer Marine Inc.'s Mem. in Opp'n to Claimants' Mot. to Dismiss, Ex. A

at 3–4, Ex. D at 4.) Secondly, Mr. Gonzalez testified in his deposition that barge ET–715 was placed in a floating dry dock with the crane barge alongside. The crane cable was hooked to the large pieces of steel being cut for scrap and, once they were severed, the crane operator was to pull the pieces out of the way. (Wepfer Marine Inc.'s Mem. in Opp'n to Claimants' Mot. to Dismiss, Ex. B at 110–12.) He further stated that after the accident the crane operator told him one of the crane barge's cables had broken. (Wepfer Marine Inc.'s Mem. in Opp'n to Claimants' Mot. to Dismiss, Ex. B at 193.) Finally, in his answers to Wepfer's first set of interrogatories, Mr. Gonzalez indicated that

[t]he section cut by Claimant was supposed to be secured by Wepfer Marine's crane. After the cut portion popped loose and began to fall, Claimant fell from the riverside or port side of the barge at the quarter cavil area onto Wepfer Marine's drydock. Claimant has learned that one of the crane cables apparently broke and that there was a large snap or pop that made claimant bolt upright and fall over backward.

\*　　\*　　\*　　\*　　\*　　\*

Wepfer's crane, sitting on Wepfer's crane dock, was moored by Wepfer Marine adjacent to the area where Claimant was working. Wepfer's crane employed cables to hold the piece of scrap iron being cut by Claimant from breaking or popping loose and falling. Wepfer knew that its failure to provide personal safety equipment and fall protection could lead to the type of accident described in the claim.

\*　　\*　　\*　　\*　　\*　　\*

It is obvious to Claimant that the piece of scrap iron that he cut prior to his fall was not secured, but in fact popped and fell immediately prior to Claimant's fall. Claimant contends that Wepfer Marine understood the responsibility for securing the piece of cut scrap iron through the use of Wepfer Marine's crane, on Wepfer Marine's crane barge, which was put in place by Wepfer Marine's employees, and Wepfer's cables were being used to secure the piece of cut scrap iron which broke loose prior to Claimant's fall.

(Wepfer Marine Inc.'s Mem. in Opp'n to Claimants' Mot. to Dismiss, Ex. E at 3–5, 8.)

■ In the event the cause of an injury is in dispute, the district courts are permitted to seek guidance from general tort principles of proximate cause. *Jerome B. Grubart, Inc.*, 513 U.S. at 536–38, 115 S.Ct. at 1049–50; *Ayers v. United States*, 277 F.3d 821, 826 (6th Cir.2002), *cert. denied*, 535 U.S. 1113, 122 S.Ct. 2330, 153 L.Ed.2d 161 (2002). Proximate cause has been defined as a person's wrongful conduct which is a substantial factor in bringing about harm to another. *See, e.g., Egervary v. Young*, 366 F.3d 238, 246 (3d Cir.2004), *cert. denied*, 2005 WL 35844, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 73 U.S.L.W. 3163 (2005) (No. 04–356); Restatement (Second) of Torts § 431 (1965). Upon reviewing the documents and pleadings filed in this case, it is clear to the Court that the Claimants have alleged the failure of the cable attached to the crane barge was a substantial factor in causing the injury to Mr. Gonzalez. Accordingly, Wepfer's petition to limit liability as to the crane barge is properly before this Court, notwithstanding the Claimants' recent protests to the contrary. As the Claimants do not seek dismissal of the limitation action as to the crane barge, however, the Court will not address that issue herein.

■ The Court now turns to the question of timeliness. Under the Limitation Act, a vessel owner "may" file its petition in the district court within six months "after a claimant shall have given to or filed

with such owner written notice of claim." 46 U.S.C. § 185. "Though the statute uses the word 'may,' it has been held to mean 'must' in the sense that an owner may file such proceedings within six months or not at all." *Cincinnati Gas & Elec. Co. v. Abel,* 533 F.2d 1001, 1003 (6th Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 136 (1976); *see also Exxon Shipping Co. v. Cailleteau,* 869 F.2d 843, 846 (5th Cir.1989); *Group Therapy, Inc. v. White,* 280 F.Supp.2d 21, 33 (W.D.N.Y. 2003). This interpretation is in keeping with the purpose of the time period, which is to "require the shipowner to act promptly to gain the benefit of the statutory right to limit liability." *Exxon Shipping Co.,* 869 F.2d at 846.

▮▮▮ The Limitation Act does not define "written notice of claim" and the requirements for such notice are somewhat unclear. *See UFO Chuting of Haw., Inc.,* 233 F.Supp.2d at 1257. However, it is well-settled that letters forwarded to vessel owners by claimants may constitute sufficient notice to satisfy the statute. *See Doxsee Sea Clam Co., Inc. v. Brown,* 13 F.3d 550, 554 (2d Cir.1994); *Complaint of Beesley's Point Sea–Doo, Inc.,* 956 F.Supp. 538, 540–41 (D.N.J.1997). It has been held that "[a] written notice of claim sufficient to trigger the filing-period must reveal a reasonable possibility that the claim is subject to [limitation of liability]." *See Billiot v. Dolphin Servs., Inc.,* 225 F.3d 515, 517 (5th Cir.2000) (internal quotation marks omitted). Thus, whether a letter constitutes "written notice" for purposes of the statute depends on its specific content. *Beesley's Point Sea–Doo, Inc.,* 956 F.Supp. at 541. Such notice is sufficient if "(1) it informs the shipowner of an actual or potential claim (2) which may exceed the value of the vessel (3) and is subject to limitation." *Complaint of McCarthy Bros. Co./Clark Bridge,* 83 F.3d 821, 829 (7th Cir.) (citing *Doxsee Sea Clam Co.,* 13 F.3d at 554), *cert. denied sub nom. Campbell v. McCarthy Bros. Co./Clark Bridge,* 519 U.S. 950, 117 S.Ct. 361, 136 L.Ed.2d 253 (1996). Courts have also determined that the written notice must inform the vessel owner of (1) the details of the occurrence, (2) the claimant's assertion that the owner was to blame for the injury, and (3) his intention to seek damages from the vessel owner. *See In re Complaint of Bisso Marine Co.,* No. Civ. A. 02–3249, 2003 WL 1193683, at *2 (E.D.La. Mar. 12, 2003); *In re Complaint of Salty Sons Sports Fishing, Inc.,* 191 F.Supp.2d 631, 634 (D.Md. 2002); *In re Lewis,* 190 F.Supp.2d 885, 888 (M.D.La.2002). Letters are to be read using a "broad and flexible standard," considering the "whole tenor" thereof. *Doxsee Sea Clam Co.,* 13 F.3d at 554. Mere knowledge that the event took place is not sufficient in itself to trigger the running of the six-month statute of limitations. *Salty Sons Sports Fishing, Inc.,* 191 F.Supp.2d at 634.

On April 5, 2002, counsel for Gonzalez sent a letter to Wepfer stating as follows:

> Please be advised that I have been retained to pursue a Longshoreman and Harbor Worker's Act case as a result of the injuries received by Jose Ramon Gonzalez while working within the course and scope of his duties on March 13, 2002. By copy of this letter, I am notifying Liberty Mutual of my representation.

(Liberty Mut. Ins. Co., Jose Gonzalez and Kimberlee Gonzalez' Joint Mot. to Dismiss for Lack of Admiralty Juris., Ex. 3.) On April 10, 2002, George G. Leavell, vice president of Wepfer, replied to counsel's correspondence thusly:

> This letter is to confirm our telephone conversation yesterday afternoon wherein I advised that Jose Ramone Gonzalez was not employed by Wepfer Marine, Inc. on the date of his accident. Mr. Gonzalez is employed by Robinson

Maintenance, Inc. Accordingly, Wepfer Marine is not the proper party to a Longshoreman and Harbor Worker's Act claim in this case.

(Liberty Mut. Ins. Co., Jose Gonzalez and Kimberlee Gonzalez' Joint Mot. to Dismiss for Lack of Admiralty Juris., Ex. 5.) The Claimants argue that the April 5 letter constituted notice for purposes of the Act and, as Wepfer did not seek limitation on liability in this Court until almost a year later, the petition was untimely.

Prior to initiating their state court action, the Claimants' communication with Wepfer provided notification that Mr. Gonzalez was represented by counsel and that he was pursuing a Longshoreman and Harbor Workers Compensation Act (LHWCA) claim based on injuries received on the job on a certain date. The April 5 letter contained no details of the incident or the injuries suffered, the vessel upon which the injury occurred, or whether the vessel was owned by Wepfer. Nor did Gonzalez inform Wepfer that it was to blame for the injury or that he intended to seek damages therefor. Moreover, there was no information in the letter that would have indicated to Wepfer the existence of a claim which may exceed the value of a vessel it owned and that was subject to limitation. Accordingly, the Court finds that the April 2002 correspondence did not provide notice sufficient to trigger the running of the six-month statutory period. *See Group Therapy. Inc.,* 280 F.Supp.2d at 33–35 (letter advising that counsel had been retained, identifying the date and location of the accident and the boat involved and requesting that owner contact his attorney and insurer, but failing to describe the type of injury sustained or details on how the injuries were suffered, or notifying owner of a potential claim against him that might exceed the value of the vessel not sufficient); *Bisso Marine Co.,* 2003 WL 1193683, at *2 (notice requirements not fulfilled where letters failed to provide the location, date, or any other details of the incident, including the identity of the vessel involved; and made no claim that the vessel owner was involved or that it was responsible for the injury); *UFO Chuting of Haw., Inc.,* 233 F.Supp.2d at 1258 (notice insufficient where letter stated only that claimant had suffered injuries without including a description thereof, the meaning of her reference to "substantial medical expenses," or that a claim was being made against the vessel owner); *Salty Sons Sports Fishing, Inc.,* 191 F.Supp.2d at 635–36 (letters did not inform the vessel owner of the demand of a right or that it was being blamed for injuries sustained, that compensation was being sought, or that such compensation might be expected to exceed the value of the vessel; therefore, notice was insufficient); *Cal Dive Int'l, Inc. v. Johnson,* No. CIV. A. 01–852, 2001 WL 1098060, at *1 (E.D.La. Sept. 18, 2001) (bill for funeral expenses unaccompanied by correspondence stating claimant's intentions did not invoke the statute of limitations); *McCarthy Bros. Co./Clark Bridge,* 83 F.3d at 829 (notice not sufficient where nothing in the letter indicated the claim would exceed the value of the vessel); *In Matter of Capital Marine Supply, Inc.,* Nos. Civ. A. 95–0844, Civ. A. 95–0846, Civ. A. 95–0847, 1995 WL 550974, at *1–2 (E.D.La. Sept. 12, 1995) (letter giving no details of accident beyond date of occurrence and failing to state a specific demand of right, a direct claim of liability aimed at any certain party, or alleging any obligation due beyond compensation under the LHWCA insufficient to trigger statute); *Matter of Texaco, Inc.,* No. Civ. A. 90–4056, 1991 WL 267752, at *2 (E.D.La. June 20, 1991) (notice not sufficient where plaintiffs' correspondence concerned only the injured worker's ability to receive compensation under the LHWCA and contained no language blaming Texaco for the accident or stating an

intention to seek damages from Texaco). As a consequence, since Wepfer did not receive proper written notice until Mr. Gonzalez filed his complaint in state court, its petition for limitation was timely.

For the reasons articulated herein, the Claimants' motion to dismiss is GRANTED IN PART AND DENIED IN PART.